*In re* MARRIAGE OF CONSTANCE J. GARGUS, Petitioner-Appellee, and JAMES L. GARGUS, Respondent-Appellant.

First District (3rd Division)    No. 80-1569

Opinion filed May 27, 1981.—Modified on denial of rehearing July 15, 1981.

Richard Gigante, of Chicago (Paul R. Jenen, of counsel), for appellant.

Rose M. Urban, of Robbins, Coe, Rubinstein & Shafran, Ltd., of Chicago, for appellee.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

Respondent, James L. Gargus, appeals from an order of the trial court transferring physical custody of his minor children from him to petitioner, Constance J. Gargus, presently Constance Campbell. On appeal respondent contends that the order modifying the physical custody was against the manifest weight of the evidence; that the findings of the court did not satisfy the requirements of section 610(b) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1979, ch. 40, par. 610(b)); and that the court abused its discretion in ordering respondent to submit to examinations conducted by a psychiatrist and a psychologist employed by petitioner. The facts are as follows.

The parties were married on January 23, 1970. Two children were born to the marriage: Christine, on December 6, 1971, and Robert, on May 19, 1974. Petitioner sought a divorce in 1977, and respondent filed an answer and counter-complaint. On February 15, 1978, a judgment for dissolution of marriage was granted. Pursuant to a settlement agreement incorporated in the judgment, the parties were awarded joint custody of the children. Respondent was granted physical custody, while petitioner was granted liberal rights of visitation. The judgement recited that both parents were fit to have custody but that it was in the children's best interests to be placed in the physical custody of respondent.

On April 6, 1979, based on affidavits filed by petitioner and a psychiatrist, Dr. Helen L. Morrison, the trial court granted petitioner leave to file a petition for a change of child custody. (Ill. Rev. Stat. 1979, ch. 40, par. 610(a).) Alleging that respondent did not provide an emotionally healthy and stable environment and was not fit to have joint custody, petitioner requested full custody of the children. Respondent filed a

counterpetition for sole custody. At the hearing on those petitions, the following pertinent evidence was adduced.

Petitioner, 33 years old, married Michael Campbell, 25 years old, in 1979, and resides with him and her mother in her mother's home. She is a secretary and has a flexible work schedule. Petitioner regularly exercises her rights of visitation and works as a "room mother" at the children's school. If she were awarded custody, the children would continue to attend the same school. A friend would babysit while she is working. Campbell is self-employed as a remodeling contractor. He participates in visits with the children.

Respondent, 37 years old, was residing with the children in the marital home. As a result of a 1973 industrial accident, he is disabled and receives social security disability payments. Respondent also received a net personal injury award of $100,000, which he invested in a certificate of deposit earning $1,064 in interest per month. Although he is no longer able to work as a pipefitter, he occasionally repairs friends' automobiles. A neighbor babysits for Robert in the morning.

According to both parties, the children are presently doing well scholastically and socially. Christine has been experiencing nightmares and stomach aches, and appears upset over the custody proceedings. Respondent testified that Christine has been receiving treatment from a child psychiatrist for six weeks, and her condition has improved. Robert has allergies.

Initially, upon separation from respondent, petitioner had taken the children with her. When respondent objected, she gave the children to him; she thought he would return them to her. Petitioner stated that she agreed to joint custody because it would allow both parties to participate in raising the children. She further reasoned that respondent would be home during the day while she worked. Petitioner also suggested that she feared harm from respondent. The Cook County Department of Supportive Services had conducted a family investigation and submitted a report to the trial court before the parties entered into the settlement agreement.

Petitioner testified that respondent failed to permit her to exercise visitation privileges on several occasions, although she acknowledged that on one such occasion, she was afforded a make-up visitation day. She also stated that respondent has failed to inform her of events in which the children participate and to consult with her regarding major decisions such as the children's travel plans or health problems. Respondent denied such accusations.

Petitioner detailed incidents which led her to become concerned about respondent retaining custody of the children. Recently, Christine telephoned her at 2:30 a.m. crying that she was unable to locate respondent in the home and that he was not responding to a buzzer installed in

the garage. Upon petitioner's instruction, Christine pressed the buzzer again and respondent answered. Respondent testified that the buzzer had corroded and was not operating properly. He has since installed a new intercom system allowing them to hear one another and the children have been instructed in its use.

Another incident involved a written article suggesting that children sometimes adjust better to a parent's death than to custodial fighting. Petitioner testified that, shortly after the dissolution, in the children's presence, respondent handed her the article and suggested that she go somewhere and die. The children became very upset. To reassure them that she is healthy, as well as to check on their well-being, petitioner calls the children every day. Respondent denied making such statement and stated that petitioner and he were alone when he gave her the article.

On another occasion, after waiting five minutes for respondent to pick Christine up at school, petitioner began to drive Christine home. Halfway home, respondent blocked her path with his automobile, and told her that she did not have permission to drive Christine home. Christine began screaming and Robert, seated in respondent's automobile, also cried. Respondent testified that, unable to find Christine, he thought she might have been harmed. He also was angry that petitioner had not advised him earlier that she would be driving Christine home.

Petitioner also recounted an incident in which respondent, when asked to spell "Michael" for a valentine card Robert was making for her husband, spelled the word "Dummy." When Christine pointed out the mistake, Robert was upset that the card had been ruined. Petitioner also testified that respondent denigrated her in the presence of the children.

Petitioner further testified that in 1979, after respondent's return from a trip to Arizona, Christine informed her that respondent was planning to move to Arizona. Christine was upset because she wanted to be able to see both parents. Respondent testified that his plans to move to Arizona for Robert's health had fallen through and he no longer intended to move there.

Campbell also expressed his concern over respondent's continued custody. Once respondent would not allow the children to visit petitioner in the hospital even though it was her visitation day.

Respondent testified that he feared petitioner would not properly care for the children. He recounted that in 1976, when Christine had been slow in dressing, petitioner picked Christine up by her hair and kicked her several times in the leg, leaving bruises. Petitioner denied kicking Christine. She admitted that she had once slapped Christine in the face and pulled her hair, but stated that it has not occurred since Christine was three years old.

Three expert witnesses gave opinions on the custody issue. Dr. Helen

Morrison, a psychiatrist employed by petitioner's counsel, examined both parties, Campbell, and the children. She concluded that petitioner had no mental disorder and was fit to care for the physical and emotional health of the children. At the time of the dissolution petitioner was undergoing a great amount of stress. Petitioner's situation has changed as a result of her remarriage and new type of employment. Dr. Morrison believed that Campbell would be able to participate well in caring for the children.

Dr. Morrison found that Christine was experiencing difficulty in her psychological functioning as demonstrated by her nightmares. Christine is in need of psychiatric treatment. Respondent was not to blame for Christine's nightmares. Christine informed the witness that she frequently goes into respondent's bedroom at night, but he is in the garage fixing automobiles, and that at times he inserts pillows in his bed to make it appear that he is there. Christine expressed a preference to live with petitioner. Robert exhibited emotional immaturity. He displayed a closer relationship to petitioner than to respondent. Robert told Dr. Morrison that he wished to live with his mother because his father was going to leave the area.

Dr. Morrison concluded that respondent was suffering from a psychiatric disability intensified by stress. She requested psychological testing and recommended that Dr. Marshall Silverstein conduct the examination. His report supported her opinion that respondent was suffering from a paranoid personality disorder. He probably had this condition throughout his life. Because of his disorder, respondent was an unfit father and would be unable to consider the best interests of the children. Asked about discrepancy between her diagnosis and that of the court-appointed psychiatrist, Dr. Morrison acknowledged that paranoid personality disorder is a difficult diagnosis to make, and that respondent's difficulty in relation to women may have influenced the examination. In her opinion, the current environment endangers the emotional health of the children. Dr. Morrison believed that it would be in the best interests of the children, especially their emotional health, to be placed in the custody of petitioner and Campbell.

Dr. Marshall L. Silverstein, a clinical psychologist employed by petitioner, testified to the results of his examinations of petitioner and respondent. He administered a standard battery of tests for evaluating personality or psychological functioning. He concluded that petitioner had no psychological disturbance or pathology. Petitioner is effective, competent, and unusually capable of executing a maternal role.

Dr. Silverstein noted that respondent was cooperative and motivated to participate, but was unusually anxious, nervous and tense during the testing. The witness diagnosed respondent as having a paranoid personality disorder and that such condition was chronic and irreversible under

most circumstances. His diagnosis was based upon the following observations: that respondent exhibited a high degree of anxiety which persisted throughout the testing; that his anxiety appears to interfere with his capacity to function; that at times the anxiety makes him feel that he is unable to hold himself together and sometimes to border on decompensation, meaning that his behavior may fail to have an adaptive functional quality and may become disturbed; that he perceives his environment as threatening and unsafe, causing him to react in ways not justified by the reality of the situation; that he uses the defense mechanism of projection to a point where it borders on unreality; that he tends to be distrustful of women; that his sense of identity is impaired; that he appears ambivalent, undecided and unsure about his role as a father and his ability to parent effectively. Dr. Silverstein concluded that respondent's disorder would be highly deleterious to the children. Children need a stable, predictable parental figure, and respondent's high level of anxiety could at times be disruptive to his life and make him unable to provide the support his children require. The long-term effect would be clinical disorder or dysfunction in the children. On cross-examination, Dr. Silverstein indicated that he would expect a person being evaluated for purposes of a custody proceeding to exhibit anxiety; that respondent's disorder had not decompensated to the point of psychosis; and that he never observed the children. The witness stated that petitioner was far more effective as a parent and was deserving of custody. He recommended that respondent be allowed visitation in the presence of another adult.

Dr. Dennis C. Grygotis, the court-appointed psychiatrist, also examined the parties and children. He concluded that petitioner had no psychiatric disorder. She was immature; had a history of feeling insecure and unprotected; fears being alone and handling responsibility; and has difficulty with the stress of being rejected or abandoned. He also observed that petitioner appeared to have made developmental gains and a good adjustment in her life and to have grown as a parent since her remarriage.

Dr. Grygotis concluded that respondent was anxious and mildly depressed, probably as the cumulative result of respondent's accident, loss of livelihood, dissolution of his marriage, and potential loss of his children. In the witness' opinion, respondent loves his children intensely and is not incapacitated by his depression to the point where he cannot care for the children. In fact, respondent has made developmental gains in his personality and is improving in his ability to cope with life. Dr. Grygotis perceived no overt evidence of any paranoid personality disorder in respondent and found no evidence to substantiate the allegation that respondent seriously endangers the mental, moral, or emotional health of the children. On cross-examination, he said that respondent's physical

control might be detrimental to the children in the future, underscoring the word "might." Respondent's inability to relate to women would have no short-term effect on Christine. While it could possibly have some effect when she reaches puberty, Dr. Grygotis emphasized that it is difficult to predict inasmuch as people change. Discussing the possible reasons for the discrepancy between Dr. Morrison's diagnosis and his own, he stated that respondent's difficulty relating to women may have caused him to be more anxious and apprehensive in the presence of the female examiner. Such exaggerated anxiety would be temporary and would not extend into one's normal life. Moreover, custody proceedings and the concomitant fear of losing one's children can be very stressful. It would be normal for a parent being evaluated for purposes of a custodial contest to exhibit signs of anxiety. Commenting upon Dr. Silverstein's report, Dr. Grygotis remarked that the tests administered were an inadequate battery of tests, and that the finding that respondent was cooperative conflicted with the later statement that unusually high anxiety persisted. After reviewing the raw data obtained by Dr. Silverstein, Dr. Grygotis found some responses that would suggest paranoid thinking. He acknowledged that he did not have the opportunity to observe respondent's demeanor during the test performance. Yet Dr. Grygotis maintained that he perceived no evidence of a paranoid disorder, and that if respondent were significantly paranoid, he would have seen some manifestations of the condition during his interview session.

Dr. Grygotis believed that Christine probably suffered from a childhood depressive neurosis, but found no signs of any serious psychiatric disorder. Her stomach aches are manifestations of depression and the nightmares reflect her fears and uncertainty about her future. Christine expressed strong feelings about wanting a reunion of her family. When asked what she would wish for if she had three wishes, she said that she would like to spend the whole weekend with respondent. Dr. Grygotis did not find that Christine had a strong attachment to respondent but that she did have some fairly positive caring feelings for petitioner. He found Robert to be inhibited, withdrawn, socially delayed, and depressed. Robert's family drawing included only respondent, Christine and himself. Nevertheless, Dr. Grygotis believed both parents were important to Robert. Upon observing respondent and Robert together, the witness noticed a close relationship and a very strong attachment. Dr. Grygotis believed the primary cause of the children's depression was the stress created by the marital discord and dissolution. He acknowledged, however, that respondent's depression could cause either child to become depressed and would affect respondent's ability to parent. Dr. Grygotis opined that Christine wished to reside with petitioner and Robert preferred to remain with respondent. Robert's bond to respondent appeared stronger than Christine's preference for petitioner. In view of

Robert's dependence upon Christine, it would be inadvisable to separate the children.

Unable to conclude that one parent was more fit than the other, Dr. Grygotis recommended that joint custody, with respondent having physical custody, should continue. He explained that children need a sense of predictability and consistency and that movement from one household to another is stressful. Dr. Grygotis believed that a change in households would not be optimal at this time, especially in view of the fact that the children seemed to be doing better both socially and in school.

Thereafter, having considered the evidence and arguments of counsel, the trial court expressly found that, based upon the facts which have arisen since the judgment of dissolution and upon facts which were unknown to the court at the time of the entry of the prior judgment, a change has occurred in the circumstances of the children and respondent; that modification of the prior custody judgment is necessary to serve the best interests of the children; that the children's present environment endangers seriously their mental and emotional health; and that the harm likely to be caused by a change of environment is outweighed by its advantages to the children. Based upon these findings, the court entered an order retaining joint custody but modifying the judgment of dissolution to grant physical control of the children to the petitioner. Respondent's motion to stay the transfer of custody is denied.

In ruling on the petition to modify the custodial arrangement, the trial court applied section 610(b) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1979, ch. 40, par. 610(b)). Section 610(b) provides in relevant part:

> "(b) The court shall not modify a prior custody judgment unless it finds, upon the basis of facts that have arisen since the prior judgment or that were unknown to the court at the time of entry of the prior judgment, that a change has occurred in the circumstances of the child or his custodian and that the modification is necessary to serve the best interest of the child. In applying these standards the court shall retain the custodian appointed pursuant to the prior judgment unless:
>
> * * *
>
> (3) the child's present environment endangers seriously his physical, mental, moral or emotional health and the harm likely to be caused by a change of environment is outweighed by its advantages to him."

Modification of a prior custody judgment under section 610(b) requires a two-step approach. The petitioner first must satisfy the "jurisdictional prerequisites" of one of the subsections (b) (1) through (3). Subsection (3) is applicable in the present case. Only after these conditions have been satisfied does the court proceed to consider the best interest of the child

under section 602(a). Ill. Rev. Stat. 1979, ch. 40, par. 602; *In re Marriage of Batchelor* (1980), 89 Ill. App. 3d 781, 412 N.E.2d 49; *In re Custody of LaMarca* (1979), 78 Ill. App. 3d 26, 397 N.E.2d 31.

■■ A change in physical custody, despite the retention of joint custody, is a modification contemplated by section 610. (See *In re Marriage of Batchelor; Carroll v. Carroll* (1978), 64 Ill. App. 3d 925, 382 N.E.2d 7.) Petitioner urges, however, that although the trial court applied the jurisdictional prerequisites of section 610, the only applicable standard here was the best interest criteria set forth in section 602. Pointing out that the prior custody order was achieved by agreement and that the parties presented no evidence in the dissolution proceeding on the issue of custody, petitioner suggests that the court in the present proceeding could exercise initial discretion and that a change in circumstances need not be demonstrated in determining the need for a change in custody.

■■ We are aware of authorities under the former Divorce Act holding that where the original custody judgment has resulted from an agreement of the parties and the trial court has not heard evidence concerning the child's best interests, the court should be allowed to hear all evidence *de novo* when one party subsequently petitions for modification. (See, *e.g., Schultz v. Schultz* (1976), 38 Ill. App. 3d 678, 347 N.E.2d 749; *McDonald v. McDonald* (1973), 13 Ill. App. 3d 87, 299 N.E.2d 787.) We do not believe such practice is permissible under the new Act. (See Ill. Ann. Stat., ch. 40, par. 610, Historical and Practice Notes, at 95 (Smith-Hurd 1979).) In *In re Custody of LaMarca,* where, as here, the original custody order arose out of a settlement agreement, this court expressly held that the standards of section 610(b)(3) had to be satisfied prior to consideration of the best interest criteria under section 602. Moreover, we do not believe such practice comports with the statute's underlying policy to maximize the finality of child custody judgments without jeopardizing the child's well-being. By creating a presumption in favor of the present custodian, the legislature sought to foster stability and continuity in the child's custodial and environmental relationships. (*In re Custody of Harne* (1979), 77 Ill. 2d 414, 396 N.E.2d 499.) To allow the courts to exercise initial discretion in a modification proceeding would render such presumption nugatory.

■■ Under section 610, the broad discretion afforded the trial court in matters of custody modification has been tempered by the desire for finality in child custody judgments and a presumption in favor of the current custodian. (*In re Marriage of Batchelor*; see *In re Marriage of Poston* (1979), 77 Ill. App. 3d 689, 396 N.E.2d 576.) Since the shifting of custody from one parent to the other may cause emotional damage to a child by creating a feeling of insecurity and lack of self-worth, a court should not order a further change in the child's custodial arrangement

unless the reasons are compelling and relate directly to the child's best interests. *In re Marriage of Rizzo* (1981), 95 Ill. App. 3d 636, 420 N.E.2d 555.

Applying these principles, we must review the evidence to determine whether the trial court properly transferred physical custody of the minor children from respondent, with whom they had resided for three years, to petitioner. While we are mindful of the superior position of the trial court to observe the witnesses and evaluate their testimony (*In re Marriage of Sieck* (1979), 78 Ill. App. 3d 204, 396 N.E.2d 1214), after careful examination of the record we are compelled to conclude that the trial court decision to modify physical custody was not warranted by the evidence.

The trial court perceived the present situation as a "troubling case." In its oral pronouncement, the court observed that both parents were emotionally involved with the children; that both would make any sacrifice necessary for the children's health; and that both children displayed a strong attachment to each parent. The court also found that respondent had not deliberately failed to consult with petitioner or keep her informed of the children's progress; that the garage episode was an isolated incident and did not reflect a lack of concern for the children on the part of respondent; and that the valentine incident, although showing poor judgment, was attributable to hostility or bitterness between the parties. The court concluded, however, that while the childrens' physical needs are being taken care of, the present environment seriously endangers their mental and emotional health.

Detailing the reasoning for its ruling, the court recited, in part, that regardless of label or diagnosis, respondent has emotional problems, has not worked since 1973, is a loner, has a limited social life, is mildly depressed and anxious, and has a lifelong problem relating to women. Respondent's expressed intention to move to Arizona for his health despite the children's strong attachment to petitioner was deemed to suggest that he was prepared to put his own wishes ahead of the children's needs. The court further observed that the children were experiencing problems in their environment: Christine is depressed and has recurring nightmares and stomach aches, but enjoys an active social life and seems to be achieving well in school; Robert is immature but is otherwise doing well. The court finally stated that it did not believe the facts concerning respondent elicited at the hearing were known to the trial court at the time it entered the judgment for dissolution awarding physical custody of the children to respondent.

As to the latter finding, it is unclear what evidence, if any, of respondent's mental status was known to the court that approved the parties' settlement agreement. Apparently the court was furnished with a report prepared by the Cook County Department of Supportive Services

which was favorable to respondent and adverse to petitioner. Moreover, the judgment contained a finding that while both parents were fit, it was in the best interests of the children to be placed in the physical control of respondent. We need not resolve this question, however, because we find insufficient evidence to demonstrate that the present environment endangers seriously the mental or emotional health of the children.

The evidence disclosed that respondent was experiencing emotional problems. The testimony was conflicting as to whether respondent was mildly depressed or had a paranoid personality disorder. Evidence also disclosed Christine's nightmares and stomach aches and Robert's immaturity and suggested that the children might be suffering from depression. Yet there was an insufficient factual basis to link respondent's condition to the problems the children were having, or to substantiate that his condition or conduct had a present deleterious effect on the children or threatened to affect them adversely in the future.

Contrary to petitioner's contention, we are not persuaded that the factual incidents detailed by petitioner, singly or cumulatively, were of such a nature as to endanger seriously the children's mental health. While some of respondent's actions may reflect poor judgment or denigration of petitioner, the trial court properly found that such conduct did not evince a lack of concern for the children but rather constituted isolated events attributable to the animosity between the parties. None of the doctors suggested that these episodes, other than perhaps the garage incident, had a deleterious effect on the children's well-being. And respondent promptly took corrective measures to prevent a recurrence of such event.

Testifying to causation of the children's problems, Dr. Grygotis concluded that the primary factor was the stress occasioned by the parties' marital discord and dissolution, not respondent's depression. Even Dr. Morrison, who testified that Christine's nightmares had become more bothersome, acknowledged that respondent could not be blamed for the nightmares. Dr. Grygotis testified that there was nothing to substantiate the allegation that respondent seriously endangers the mental or emotional health of the children; that respondent's continued physical control "might" be detrimental to the children in the future, emphasizing "might"; and that respondent's difficulty relating to women would have no short-term effect upon Christine, although it could possibly have an effect when she reaches puberty. Dr. Grygotis also declared that respondent had made developmental gains in his personality; and that the children recently appeared to be doing better scholastically and socially while still in respondent's physical control.

In contrast, Dr. Morrison testified that because of respondent's paranoid personality disorder, the current environment "endangers" the emotional health of the children and respondent would be unable to

consider the children's best interest. As an example for her conclusion, Dr. Morrison discussed the garage incident and respondent's failure to remain in the home to attend to Christine. The court, however, properly viewed the garage incident as an isolated event. While Dr. Morrison testified that Christine was in need of psychiatric treatment, the court noted that Christine was receiving such treatment.

Similarly, Dr. Silverstein opined that respondent's disorder would be harmful to the children because they need a stable, predictable parental figure and respondent's high level of anxiety might make him unable to provide the support needed. He also testified that the long-term effect of respondent's continued custody would be clinical disorder or dysfunction in the children. Yet Dr. Silverstein acknowledged that a person undergoing evaluation for purposes of a custody contest would be expected to exhibit anxiety; that respondent's personality had not decompensated to the point of psychosis; and that he had never examined the children.

Finally, only Dr. Grygotis testified to the possible effects of a transfer of physical custody upon the children. He acknowledged that petitioner had become more active in the children's lives and that they were accustomed to being in her home. He maintained, however, that any move to another household is stressful; that petitioner's lifestyle would differ from that of respondent; and that, especially in light of the children's recent improvement and adaptation to school, it would be an inopportune time to transfer physical custody.

Petitioner claims that the evidence adduced at the hearing on her petition for modification was as persuasive as that which supported a modification of custody in the case of *In re Custody of Scott* (1979), 75 Ill. App. 3d 710, 394 N.E.2d 779. We disagree. In *Scott*, the mother, the custodial parent, had a history of paranoid schizophrenia and of hospitalization for that condition. While she was on a trip with the minor child, the mother suffered a psychotic episode which necessitated overnight placement of the child in a children's home. The mother was subsequently hospitalized for approximately two months. At the hearing on the father's petition for change of custody, a psychiatrist testified that it might be harmful to place the child in the mother's custody because of the possibility of a recurrence of her schizophrenia and that another episode could have a very negative effect on the child. That testimony was deemed sufficient to support the trial court's determination that the child's environment seriously endangered her health and that a modification of custody was warranted. Here, in contrast, there was no evidence of a psychotic episode on the part of respondent. On the contrary, Dr. Silverstein stated that respondent's personality had not reached the level of psychosis. Moreover, Dr. Grygotis stated that respondent's depression did not render him incapable of caring for the children.

■■ It is clear that both parties love and have deep concern for the children and that the children have attachments to both parents. Finding insufficient evidence to demonstrate "serious endangerment" we hold that the modification of physical custody was unnecessarily disruptive of the lives of the children and accordingly was improper. In view of our holding, we need not consider the remaining issues raised by respondent.

For the reasons stated, the order of the circuit court of Cook County modifying the judgment of dissolution to award physical control of the children to petitioner is reversed.

Reversed.

McGILLICUDDY and WHITE, JJ., concur.