In re MARRIAGE OF GARY DAVID FRIEDMAN, Petitioner-Appellee, and CAROLYN J. FRIEDMAN, Respondent-Appellant.

First District (4th Division)    No. 80-2677

Opinion filed September 24, 1981.

James O'Brien, of Spagat & O'Brien, Ltd., and Beermann, Swerdlove, Woloshin, Barezky & Berkson, both of Chicago (Miles N. Beermann, Howard A. London, and James O'Brien, of counsel), for appellant.

Arvey, Hodes, Costello & Burman and Kaufman & Litwin, Ltd., both of Chicago (Stuart Litwin, Charles J. O'Connor, and Rosemarie J. Guadnolo, of counsel), for appellee.

Mr. PRESIDING JUSTICE ROMITI delivered the opinion of the court:

Respondent Carolyn Friedman appeals from a judgment of the circuit court of Cook County modifying the custody provision of a judgment of dissolution of marriage so as to change the residence of her son, Jonathan, from her home to that of his father, petitioner Gary Friedman. The sole issue on appeal is whether the judgment of the trial court was contrary to the manifest weight of the evidence.

We affirm.

The parties were married in February 1965. They had two children: Gregory, born May 28, 1967, and Jonathan, born August 5, 1970. On February 14, 1978, the parties obtained a judgment of dissolution of

marriage from the circuit court of Du Page County. Incorporated in the judgment was a marital settlement agreement which provided in part that the parties would share joint custody of the children but they would reside with Carolyn until it was in the children's best interest that they reside elsewhere. On April 30, 1979, an agreed order was entered in the circuit court of Du Page County providing that Greg was to reside with Gary. This action was instituted on July 29, 1980, when Gary filed a petition to modify the judgment of dissolution of marriage so as to allow Jonathan to reside with him.

At the hearing on the petition the following pertinent evidence was introduced. Gary, a partner in a Chicago law firm, testified that he was remarried in February 1980. He lived in a three-bedroom condominium on Lake Shore Drive in Chicago with his wife, Johnna, her young daughter, and Greg. Jonathan resided with his mother, Carolyn, in Northbrook.

In February 1979, Gary returned to his office and found Greg there. Greg told him Carolyn had dropped him off and he was to live with Gary. The next day, according to Gary, Carolyn told him that Greg was his problem now, that she could not and would not deal with him. She had not previously told Gary she was bringing Greg over or that he was to live with Gary on a permanent basis. Subsequently Gary learned from a psychologist at Greg's school that she had had discussions with Carolyn over several months concerning Greg's deteriorating attitude, behavior, and scholastic performance. The psychologist had designed a special academic program for Greg, but Carolyn did not agree with it.

Gary testified that during this period Greg had been failing all his subjects, was 20 pounds heavier, and was not involved in any extracurricular activities at school. He was generally sullen and withdrawn. According to Gary, at the time of trial Greg had lost the extra weight, was engaged in extracurricular activities, and had become confident, articulate, and outgoing. There was no material dispute at trial concerning Greg's improvement after moving in with Gary. Indeed Carolyn's attorney conceded to the trial court that:

> "There is no dispute. All of the psychiatric reports indicate Greg was a troubled child, no ifs or buts about it. Nobody disputes that and nobody disputes he has done better living with his father."

In September 1979 Greg was enrolled at the Anshe Emet Hebrew Day School. Gary testified that Jonathan would also attend this school if he obtained custody of him. The teacher-student ratio at Anshe Emet was 12 to 1, with a support staff which included a child psychiatrist, a psychologist, and a learning disability teacher. Several boys at the summer camp attended by Jonathan were his age and were enrolled at the school in his grade so that he would have several friends there were he

to enroll. Included in the school's regular curriculum were Hebrew and historical and cultural matters related to Jewish culture. Gary testified that it was important to him that Jonathan and Greg become familiar with the traditions of Judaism. Johnna's daughter was also taking this course.

Gary testified that Jonathan had been staying with him two to four weekends a month, all summer in 1978 and 1979, five to six weeks in the summer of 1980, and during Christmas, Thanksgiving and Easter holidays, except for last Easter. During the summers Jonathan attended summer camp (eight weeks in 1978 and 1979, four weeks in 1980). While living with Carolyn Gary customarily had not gotten home from work until 7 or 8 p.m. and he worked at the office two or three Saturdays a month. However he had subsequently changed his habits so that he was getting home shortly after 5 p.m. and worked only about one in five weekends. During the summer he would take off one weekday to be with his sons.

Johnna Friedman testified that she had majored in elementary education at the University of Arizona and had taught for six years. She was married in 1964 and divorced in 1975. Her only child from that marriage would be 10 in October 1980. According to Johnna her daughter and Gary's two sons got along well. She had noted that Greg had improved since he came to live with them. She had worked with him on doing his homework properly. Johnna stated she would be happy to have Jonathan live with them; she already considered him a part of the family. She also expressed a willingness to participate in therapy for him.

The trial judge conducted in camera interviews with Jonathan and Greg. Both boys indicated they got along well with each other. Jonathan told the judge that he wished to live with his mother.

Gary also presented the testimony of two expert witnesses, Dr. Marshall Falk and Dr. Jack Arbit. Dr. Falk testified he was a medical doctor specializing in psychiatry. He served as a professor of psychiatry at the Chicago Medical School and had written 18 articles in the field. In the past five years he had been appointed about 20 times to act as a consultant or expert witness on behalf of the circuit court of Cook County. In this instance he was hired by Gary to evaluate Jonathan.

In a period from April 19, 1980, to July 12, 1980, Falk had nine half-hour sessions with Jonathan. He saw him alone because he believed the presence of an adult, particularly a parent, would influence Jonathan's attitudes. The sessions were conducted over an extended period because Falk wished to see whether Jonathan's agitation and depression were related to the stress of the interviews or instead constituted a chronic situation.

Falk first elicited from Jonathan a history of his family situation. Falk observed that in relating this the only time Jonathan showed enthusiasm

or spontaneity was when he described his father and his relationship with him. Jonathan thought that because his brother had gone to live with his father it was his duty to stay with his mother. However, when he discussed his mother he became extremely agitated. He also exhibited this agitation constantly when the litigation was discussed. He was in tears and spoke in an almost inaudible voice, giving the impression that he lacked self-esteem. According to Falk, the significance of Jonathan being enthusiastic when discussing his relationship with his father was that this was something he enjoyed. In contrast, the agitation when discussing his mother was an extension of his fear and guilt over what would happen if he left her.

Toward the beginning of June Falk became concerned about the depth of pathology that Jonathan might have and he referred him to a psychologist, Dr. Arbit, for testing. (Dr. Arbit testified at the hearing, and we discuss that testimony later in this opinion.) Dr. Falk testified that the test results confirmed his own finding, that Jonathan was suffering from severe low esteem and was anxious and depressed because of his feelings of guilt and his current environment. He felt guilty about leaving his mother and felt an obligation to stay because she would be lonely when he left. Falk also believed that because of Jonathan's relationship with his grandmother (who Falk had determined from interviewing Jonathan was primarily caring for him) and his mother he did not have a male role model with whom he could come in contact on a daily basis. As a result he confided in his brother, a relationship which Falk found to be unusual between two boys three years apart.

It was Falk's opinion that Jonathan needed a male role model whom he could emulate and look up to. If there was no change in circumstances Jonathan's condition of agitation and depression would worsen as he grew older. However, if he were to reside with his father and older brother Falk believed his condition would improve. He would start to develop a normal relationship with his father and would develop more self-esteem. But because Jonathan's guilt feelings were currently pervasive he would still need psychiatric or psychological help. In summary, Falk believed that Jonathan's physical and mental health would best be served if he were to reside with his father and older brother.

In a written report submitted to the court Falk stated his belief that Jonathan wished to reside with his father. On cross-examination Falk stated that in reaching this conclusion he did not disregard the fact that on three occasions Jonathan expressed a desire to live with his mother. But Falk attributed this stated wish to Jonathan's feelings of guilt about his mother rather than being an expression of his actual wishes. Falk also did not believe it was normal for a nine-year-old boy to be as anxious as Jonathan was in the 2½-month period of his evaluation, even under the

circumstances. His low self-esteem, if related to being in a doctor's office, should have abated after a period of time. Falk conceded that to evaluate the total environment, which he would do as a court-appointed psychiatrist, it would be helpful to evaluate all the people involved. (He had also interviewed Greg, but none of the other principals.) However he saw his function as evaluating only Jonathan.

Falk's report was also admitted into evidence and contained substantially the same information and conclusions as were elicited from him at the hearing.

Dr. Jack Arbit, a clinical psychologist, had been engaged in the active practice of psychology for 25 years. He had taught for 23 years at Northwestern University Medical School and for five years at Loyola University Medical School. He served as the director of psychological testing at Northwestern Memorial Hospital and as the director of behavioral neurology at Loyola University Hospital. Arbit had published 20 to 30 articles in the field, primarily concerning diagnostic assessment and evaluation in psychological and neurological diseases.

Arbit's evaluation of Jonathan was predicated on the use of psychological tests. He had examined, evaluated, and tested Jonathan for about half a day on June 12, 1980. He first spoke with Jonathan for 25 to 40 minutes, explaining the procedures and asking some questions about his personal and family life. Then tests were administered by an examiner under Arbit's direction and supervision. The tests and their results were described by Arbit as follows.

The Wexler test, an intelligence test, established that Jonathan possessed superior intellectual ability. However Arbit believed that the score achieved was lower than Jonathan's optimal capability because of memory difficulties related to his very high level of anxiety.

The Wide Range Achievement Test, a basic measure of scholastic achievement, showed Jonathan to be superior in some areas but in the bright/normal range in others. Again Arbit believed some scores were reduced by anxiety which he did not attribute to the testing itself.

The Rorschach Psychological Test, which measures aspects of personality such as anxiety, depression, self-concept, needs, and motives, established that Jonathan was psychologically impoverished compared to what would be expected of one with his superior intellect. His creativity or originality was not at the expected level. Arbit attributed this to anxiety related to Jonathan's negative self-concept.

The Michigan Picture Story Test, measuring how one feels about one's self in relation to others, led Arbit to believe that the source of Jonathan's anxiety, which had appeared throughout the testing and observation, was related to his very poor masculine identity. This engendered feelings of inadequacy and inferiority and a lack of vitality.

Finally in the Human Figure Drawing Test, in which the subject was asked to draw pictures of himself and his family and to identify those drawings, Jonathan drew pictures of his father, brother, and step-mother. Arbit believed this indicated Jonathan identified his family as being that of his father.

After the testing Arbit reviewed the test results with Jonathan, who was cooperative and responsive but very anxious. Jonathan told Arbit he preferred to live with his father although he knew this would make his mother lonely. He also looked forward to living with his brother.

Based on all the testing it was Arbit's conclusion that Jonathan suffered from a "chronic level anxiety secondary to feelings of inadequacy and inferiority and concerns about his masculinity." Arbit believed that if Jonathan were to live with his father he would lose his anxiety over a period of time. In a written report which was admitted into evidence Arbit also stated:

> "Without some alternation [sic] in this feeling of being less manly, less competent, less capable than the man he wishes to be one will see continuing, increasing and debilitating feelings of anxiety, distress and developmental disturbances through the adolescent and young adult years."

On the court's own motion Dr. Ilse Judas was appointed to interview the parties and the children and to prepare a written report of her findings. This report was admitted into evidence and Dr. Judas also testified as the court's witness.

Judas testified that she was a physician specializing in psychiatry, psychoanalysis, child psychiatry, and child psychoanalysis. She had been engaged in private practice in these areas since 1955. She also lectured at the University of Chicago School of Medicine, where she trained psychiatric residents in child psychiatry. She had published eight to 10 articles in that field.

Judas conducted individual interviews with Gary, Carolyn, Johnna, Greg, and Jonathan. She also conducted a group interview with all those people except Johnna. The interviews occurred in early September 1980.

In her report to the court Judas stated that her conclusions were based solely on these interviews, in which she had evaluated the current mental functioning of the interviewees. She had also, in the interviews with Gary and Carolyn, reviewed their personal developmental history as well as those of their children. Judas wrote that she had read the other reports submitted to the court but discounted them because they were not based on an understanding of the development and personality structures of the parents and child involved. Thus, her conclusions were based only on her own psychiatric evaluation.

Judas found Gary to be a well-controlled man, somewhat on the

depressed side, who was able to admit to difficulties without denial. He at times became overly angry but had the capacity to look at and deal with his feelings. She found him to be the more mature of the two parents.

Carolyn, according to Judas, was unable to admit to difficulties and to deal with feelings and evidenced a pervasive use of denial. Judas found her to be impulsive and lacking insight into herself.

Judas found Johnna to be mature and in touch with her feelings, enjoying a good marriage with Gary.

Judas' evaluation of Jonathan was that he was basically depressed and anxious. He confided only in his brother. She believed his condition's origins were in deprivation in his early childhood. She believed psychiatric treatment for him was essential and would probably be prolonged. She also believed Carolyn could not support such treatment because of her inability to deal with her own feelings. However, she believed that Gary and Johnna would be able to emotionally support treatment. Judas also concluded that Jonathan's undue dependence on Greg would best be broken by having the two boys live in the same household. If Jonathan continued to live with his mother Judas predicted that the most likely outcome would be a constricted, depressed youngster, not functioning up to his academic or social capacity. She also foresaw the possibility that he would become stuck in his present stage of development, making for later difficulties in sexual identification.

Based on these findings Judas recommended that Jonathan reside with his father, with continuing visitation with his mother, and that he receive psychiatric treatment for his depression and anxiety.

In testimony at the hearing Judas explained further some of the conclusions in her report. She stated that although the roots of Jonathan's depression went back some time the present situation also contributed to it. She believed that because Carolyn could not admit that she had problems she would be unable to support Jonathan in his therapy and would give in to his desire not to be treated. Judas also testified that in mothering capacities she saw Carolyn as having difficulty with every child. The crucial aspects of Carolyn's personality with respect to her children were impulsiveness, complete denial, and externalization. She blamed things on Gary or Greg, never herself. Her inability to deal with anger was huge. Judas also believed that Greg's relationship of father-confessor to Jonathan was not in Jonathan's best interest, but adults must stop it and Carolyn was not capable of doing so. It was Judas' belief that the custody change should be made quickly; postponement would cause further damage to Jonathan.

Carolyn presented no expert testimony at the hearing but did introduce into evidence one expert's report, that of Dr. Melvin Seglin, a physician specializing in psychiatry. He had been in the private practice

of adult and adolescent psychiatry since 1955. He had served as a consultant to four hospitals and had taught and supervised residents in psychiatry at three of those hospitals. He was certified by the American Board of Psychiatry and Neurology.

Seglin interviewed the parties, their two children, and Johnna. He found Jonathan to be anxious and somewhat depressed, but attributed this to the stress of the custody dispute. Jonathan expressed what Seglin found to be a genuine desire to live with his mother, a desire uninfluenced by Carolyn's persuasion. Seglin did acknowledge that one factor was Jonathan's feeling of guilt about leaving Carolyn. However, he believed that the main reason for Jonathan's desire to remain with his mother was that he felt more comfortable with her and in the current setting where he was performing well in school. Seglin recommended that Jonathan remain with Carolyn, but also strongly recommended that he obtain immediate therapy.

Sharon Rudnick, a neighbor of Carolyn, testified that she had known Carolyn for about 7 years, although not socially. Her son was a good friend of Jonathan, and she saw Jonathan every few weeks. He seemed well adjusted, somewhat quiet but very polite and very happy in his surroundings with his mother and grandmother. Carolyn seemed to be an extremely concerned and caring person. On cross-examination Rudnick testified that in her 11 years in the neighborhood she had been in the Friedman home two or three times.

Susan Novy had been a next-door neighbor of the Friedmans for eight years. Her children often played with Jonathan. He was a quiet, very bright, happy little boy who played well with the children. She believed his relationship with Carolyn to be very good, and she perceived Carolyn as a very good mother. Carolyn's mother, who cared for Jonathan when Carolyn was at work, also appeared to Novy to be a very concerned grandmother who had a good relationship with Jonathan. On cross-examination Novy stated that in her opinion Gary was a good father and had a good relationship with Jonathan.

Suzanne Behr, a counselor at Wood Oaks Junior High School in Northbrook, testified that two years earlier in conversations with Carolyn about Greg's scholastic problems she found Carolyn to be concerned and cooperative. She had also found Gary to be cooperative and concerned about Greg.

Carolyn also introduced into evidence Jonathan's school records from kindergarten through the fourth grade. His grades for the last year were mainly B's and C's. In a comprehensive achievement test taken in 1980 Jonathan's scores placed him, in a national survey, from the top 33% to the top 3% of those examined. Comments by Jonathan's fourth grade teacher which were contained in these records indicated that he usually

appeared happy and exhibited self-confidence, sometimes showed self-discipline, and usually cooperated in class activities.

■■■ In its decision the trial court ordered that Jonathan's residence be changed to that of his father and also recommended therapy and counselling for Jonathan. Although the court also ordered that the joint custody provision of the original divorce decree be retained, it is clear that the change in physical custody ordered by the court was pursuant to section 610(b) of the Illinois Marriage and Dissolution of Marriage Act. (Ill. Rev. Stat. 1979, ch. 40, par. 610(b); *In re Marriage of Gargus* (1981), 97 Ill. App. 3d 598, 423 N.E.2d 193; *In re Marriage of Batchelor* (1980), 89 Ill. App. 3d 781, 412 N.E.2d 49.) Section 610(b) provides:

> "(b) The court shall not modify a prior custody judgment unless it finds, upon the basis of facts that have arisen since the prior judgment or that were unknown to the court at the time of entry of the prior judgment, that a change has occurred in the circumstances of the child or his custodian and that the modification is necessary to serve the best interest of the child. In applying these standards the court shall retain the custodian appointed pursuant to the prior judgment unless:
>
> (1) the custodian agrees to the modification;
>
> (2) the child has been integrated into the family of the petitioner with consent of the custodian; or
>
> (3) the child's present environment endangers seriously his physical, mental, moral or emotional health and the harm likely to be caused by a change of environment is outweighed by its advantages to him."

By its terms this section requires a two-step approach to the modification of prior custody judgments. The court must first determine whether one of the statutory prerequisites listed in subsections (b)(1) through (b)(3) exist. In this case only (b)(3) is applicable. Assuming that prerequisite is established then the court must determine whether the modification is necessary to serve the best interest of the child. (*In re Marriage of Gargus* (1981), 97 Ill. App. 3d 598, 423 N.E.2d 193; *In re Marriage of Batchelor* (1980), 89 Ill. App. 3d 781, 412 N.E.2d 49.) Clearly section 610(b) creates a presumption in favor of the present custodian, thus promoting the important factors of stability and continuity in the child's life. (*In re Custody of Harne* (1979), 77 Ill. 2d 414, 396 N.E.2d 499.) But once a trial court has determined that the presumption has been overcome in the light of the factors set out in the statute we will disturb that determination on review only where the trial court's decision was contrary to the manifest weight of the evidence or amounted to an abuse of its discretion. *In re Custody of LaMarca* (1979), 78 Ill. App. 3d 26, 397 N.E.2d 31; *Caulkins v. Caulkins* (1979), 68 Ill. App. 3d 284, 385 N.E.2d 1117.

In its modification order the trial court found, under 610(b), that:

"a) a change has occurred in the circumstances of the minor child, JONATHAN,

b) that this modified order is necessary to serve the best interests of both children, particularly JONATHAN; and

c) that JONATHAN's present environment endangers seriously his mental and emotional health and the harm likely to be caused by a change of environment is outweighed by its advantages to him."

In a subsequent order, denying respondent's post-trial motions to vacate its judgment and for a new trial, the court made additional findings which it incorporated in its original order. These included a finding that:

"Jonathan requires therapy and counselling because of serious emotional and mental problems corroborated by the doctors and respondent mother."[1]

And later, in denying respondent's post-trial motion for a stay of the judgment, the trial court stated:

"I am still convinced that the best interests of the child are being served by the change in his residence because there was clear and convincing evidence that under the environment with the mother psychiatric treatment was ineffective."

It is clear from these findings and statements of the court that it placed great credence in the findings of Dr. Judas. She concluded on the basis of her interviews that Jonathan was depressed and anxious and in need of immediate psychiatric treatment. She also concluded that Carolyn, who could not recognize her own problems, would be unable to provide the necessary support for Jonathan in obtaining help for his problems. According to Judas failure to obtain this therapy would have a deleterious effect on Jonathan's development. She thus recommended that he reside with Gary and Johnna, who she believed would be able to provide the necessary support for him in his treatment.

Carolyn cites the testimony of her neighbors who found that Jonathan was a normal, happy child who played well with their children. She also cites Jonathan's school records, which showed him to have a good academic record. Those records also included the summary conclusions of his fourth grade teacher tending to indicate that he was responsible and well-adjusted in school. Certainly these were factors for the trial court to consider. But they must be weighed against the fact that all of the experts who examined Jonathan tended to contradict this sanguine view of his emotional health. Dr. Falk found him to have low self-esteem and to be in

---

[1] The corroboration by Carolyn perceived by the court apparently came when in a pretrial motion she sought a continuance to allow her and Jonathan to obtain therapy. As a result of this motion she was again interviewed by Dr. Judas who concluded that she still was unable to support such therapy.

a state of agitation and depression. He recommended residence with Gary and psychiatric treatment. Dr. Arbit found him to have a very high level of anxiety and a negative self-concept. He also found that this resulted in Jonathan not achieving his academic potential. He concluded that if Gary obtained custody Jonathan would lose his anxiety. Even Carolyn's expert, Dr. Seglin, who recommended that Jonathan remain with her, also found him to be anxious and somewhat depressed and recommended therapy for him. On the basis of this evidence, which could not have been available to the court which entered the agreed order awarding physical custody of Jonathan to Carolyn in 1978, the trial court was justified in concluding that Jonathan's present environment seriously endangered his mental and emotional health and that any harm likely to be caused by a change of physical custody was outweighed by its advantages.

The trial court in its order also found that the fact that Jonathan and Greg had been separated was a substantial change in circumstances and that it was in the best interests of both of them that they remain together as a family unit. Carolyn contends that the evidence did not substantiate this separation as a cause of harm to Jonathan. We do not reach that issue because we have found that the evidence of Jonathan's need for psychiatric counseling and the trial court's conclusion that this could not be accomplished while he remained with his mother provided a sufficient basis for establishing the prerequisites of section 610(b).

■■ As we have noted, once the findings satisfying that section are made the court then is required to evaluate whether a modification of custody is in the best interest of the child. Among the factors to be considered by the court are those contained in section 602 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1979, ch. 40, par. 602), which provides:

> "(a) The court shall determine custody in accordance with the best interest of the child. The court shall consider all relevant factors including:
>
>> (1) the wishes of the child's parent or parents as to his custody;
>>
>> (2) the wishes of the child as to his custodian;
>>
>> (3) the interaction and interrelationship of the child with his parent or parents, his siblings and any other person who may significantly affect the child's best interest;
>>
>> (4) the child's adjustment to his home, school and community;
>>
>> (5) the mental and physical health of all individuals involved; and
>>
>> (6) the physical violence or threat of physical violence by the child's potential custodian, whether directed against the

child or directed against another person but witnessed by the child.

(b) The court shall not consider conduct of a present or proposed custodian that does not affect his relationship to the child."

Clearly the court considered the wishes of Jonathan's parents, and his own wishes were ambiguous. No threat of physical violence by either potential custodian was suggested in the record. But the overriding consideration, which relates to all the remaining factors, is the court's finding that Jonathan could not obtain needed psychiatric treatment effectively in his mother's custody. This finding necessarily had a direct impact on the factors of Jonathan's interaction with his family, his adjustment to his home, school and community, and his mental health. Evaluation of these factors in the light of the trial court's finding provides ample support for the court's conclusion that it was in Jonathan's best interest to reside with his father.

The judgment of the trial court is affirmed.

Affirmed.

JOHNSON and LINN, JJ., concur.