134 N.J. Super. 213 (1975)
338 A.2d 883
IN THE MATTER OF THE APPLICATION OF CHRISTOPHER DENNIS LONE, AN INFANT, BY HIS MOTHER AND NATURAL GUARDIAN, FIOLIA M. DEC, FOR LEAVE TO ASSUME THE NAME OF CHRISTOPHER DENNIS DEC.
Superior Court of New Jersey, Hudson County Court, Law Division.
May 1, 1975.
*214 Mr. Arnold L. Cohen for petitioner Fiolia M. Dec (Messrs. Welsh & Cohen, attorneys).
Mr. Paul M. Griffin for objector Dennis Lone (Messrs. Norton and Kalac, attorneys).
GAULKIN, J.S.C., Temporarily Assigned.
Plaintiff Fiolia M. Dec, as mother and natural guardian of Christopher Dennis Lone, an infant, brings this action to permit the child to assume her present surname of Dec. N.J.S.A. 2A:52-1; R. 4:72. The natural father, Dennis Lone, opposes the application.
Christopher was born on January 12, 1970. His parents, who had married in 1968, separated shortly after his birth and were divorced on November 24, 1970. The decree awarded custody of the child to plaintiff and granted "reasonable" visitation rights to the father.
*215 On April 4, 1974, plaintiff married Leon Thomas Dec and assumed Dec as her surname. One child, Leon Dec, has been born of this marriage. At all times since the marriage Christopher has lived with the Dec family. It is not questioned that he is well-cared for by and fully integrated into the Dec household.
Except for one or two brief periods when he lived with his parental grandparents, Christopher has been in the custody of plaintiff since her separation from Mr. Lone. For approximately three years following the separation and divorce Lone lived and worked in New Jersey and exercised his visitation rights 40 to 50 times, by his estimate. Plaintiff confirmed that during that time Lone had taken Christopher for overnight visitations some 25 times.
In October 1973, having lost his job, Lone joined the Navy. He underwent basic training in Florida and then was assigned to duty in Alaska for approximately a year. During that time he did not see Christopher at all and had only minimal contacts through sending occasional gifts. At the end of the Alaska tour of duty Lone had the opportunity to select his next assignment and requested duty along the East Coast; he did so, he testified, in order to be able to resume his contacts with Christopher. He is now stationed in Maine. Lone testified credibly and persuasively of his continuing love and affection for Christopher and his desire to maintain and advance his relationship with his son.
Although plaintiff testified that Lone is often tardy in remitting the $25 weekly child support sum required by the divorce decree, the proofs justify the conclusion that there are no arrearages now, that any past arrearages have been short-lived and of modest amount, and that plaintiff has not required any assistance of the court in enforcing the decree. Lone further provides health insurance coverage for Christopher and has named him the beneficiary of his government life insurance policy.
Neither party suggested that testimony be taken of Christopher himself. Plaintiff and her present husband, however, *216 testified that the child has indicated his wish to use the name Dec and that he calls Mr. Dec "Daddy." Given the child's age and the doubts that reasonably arise as to what prompted these usages, little weight should be given to them. Cf. Degerberg v. McCormick, 41 Del. Ch. 46, 187 A.2d 436 (Ch. 1963).
In her brief plaintiff advances essentially three reasons why Christopher should assume the surname Dec: first, that to require him "to live with a name different from his mother and brother would be to ask this child to carry a burden through his formative years that can very well have very negative psychological implications"; second, that Lone "has abandoned his child," and third, that "bureaucratic red tape" will "create chaos" if formal recognition is not given to a name which Christopher might use informally.
Only three reported New Jersey cases appear to have considered an application of this kind. In Sobel v. Sobel, 46 N.J. Super. 284 (Ch. Div. 1957), the natural father sought to restrain the mother, who had since remarried, from enrolling their children in school under any name other than his surname. The mother, who had enrolled the children in school under the surname of her second husband, resisted her former husband's application on the grounds "that he ignores the responsibility of his children, fails to provide adequate support while he operates a successful business, and is indifferent in complying with the order of visitation." Apparently no suggestion was made that psychological or emotional harm would result if the child retained his father's surname.
The Chancery Division granted the injunction. Starting with the proposition "that the welfare and happiness of the child is the controlling consideration", the judge went on to say that the use of the surname of the second husband may be desirable on occasion "when the child's father indulges in improper conduct, fails to support, abandons the child, is indifferent to its welfare," but that "there is no authority for her to change the surname of the child to that *217 of the mother's subsequent husband, unless there are extenuating circumstances." Applying these principles, the judge concluded:
Here, the father is not in default in contributing to the support of his sons nor is he charged with improper conduct, nor are there other circumstances that would move the court to deny him the right to expect his kin to bear his name. [at 287]
In W. v. H., 103 N.J. Super. 24 (Ch. Div. 1968), the judge as part of a divorce granted to the wife, granted her leave to resume her maiden name and to change the surname of the children to that name, again stating that "it is against the policy of the court to grant permission to resume a maiden name where unemancipated children who bear a different name are involved"; however, the judge found that because the husband had pleaded guilty to sexual intercourse with his eleven-year old daughter and had previously impregnated his oldest daughter, "forfeiture of [the] father's right to have his progeny bear his name" was appropriate.
In Bruguier v. Bruguier, 12 N.J. Super. 350 (Ch. Div. 1951), the judge permitted the child of divorced parents to assume the surname of her mother's second husband; although the age of the child is not noted, it appears that she was a high school student and that the change of name was at her own request.
These holdings are generally consistent with those of other jurisdictions. See Annotation, "Rights and remedies of parents inter se with respect to the names of their children," 53 A.L.R.2d 914 (1957). Thus the authorities broadly support the propositions, as stated in Sobel, that "the welfare and happiness of the child is the controlling consideration", and that the surname of the child ought not be changed to that of the mother's subsequent husband in the absence of "extenuating circumstances." Id. at 914.
The question presented, then, is whether the reasons advanced by plaintiff for the requested name change constitute *218 "extenuating circumstances." Two of those three reasons are patently without merit. As to the claim that Lone has abandoned his child, the proofs are entirely to the contrary. Lone maintained substantial contacts with his son when he was able and has arranged his Navy career to permit him to continue those contacts; he has performed his support obligations; he persuasively asserts his present intention to continue to support his son and to develop his relationship with him. The suggestions by plaintiff that Lone ought not to have entered the service, or that he should have written or telephoned or sent gifts from Alaska, are beside the point: it is neither possible nor appropriate to evaluate such gradations of paternal interest. By no reading of the record can it be said that Lone has abandoned his child, or that he has otherwise been guilty of any misconduct toward him. Cf. In re Mrs. M., 74 N.J. Super. 178 (App. Div. 1962); Application of Otis, 204 Misc. 1073, 126 N.Y.S.2d 651 (Sup. Ct. 1954).
As to the second claim  of "bureaucratic red tape" generated by maintenance of a surname different from her own  plaintiff offered nothing but its mere assertion. Speculation about such matters is not appropriate here, and any such problems that might be envisioned are minimal. Cf. In re Lawrence, 133 N.J. Super. 408 (App. Div. 1975); West v. Wright, 263 Md. 297, 283 A.2d 401 (Ct. App. 1971); Application of Hinrichs, 41 Misc.2d 422, 246 N.Y.S.2d 25 (Sup. Ct. 1964).
The remaining reason advanced by plaintiff for the change of name  that "negative psychological implications" will result from maintenance of the Lone surname  presents a more difficult question. The "implications" urged are essentially that growing up in the Dec family as the only Lone will set Christopher apart, at least in his own mind; and that among his peers his name will create confusion and embarrassment for him. No expert testimony was offered in support of these projections. Cf. Degerberg *219 v. McCormick, supra; King v. Newman, 421 S.W.2d 149 (Tex. Civ. App. 1967), rev'd 433 S.W.2d 420 (Tex. Sup. Ct. 1968).
The New Jersey cases have not considered whether or how these matters bear on a name change application made in behalf of an infant. On their face, and even though unsupported by expert testimony, such concerns appear to have persuasive and substantial relevance to the "welfare and happiness of the child." Sobel, supra. Whether they should therefore be considered "extenuating circumstances" is a question whose resolution requires examination of the policy which favors retention of the original surname in the absence of such circumstances.
The New Jersey cases justify that policy in terms which appear to have little relation to the interests of the child. Thus, in Sobel, supra, the principle that is to be honored in the absence of "extenuating circumstances" is described as "the [father's] right to expect his kin to bear his name." 46 N.J. Super. at 287. Similarly, in W. v. H., supra, the court described the presumption is in favor of the "father's right to have his progeny bear his name." 103 N.J. Super. at 26. Cases outside New Jersey also frequently define the policy favoring retention of the original surname in such terms of the father's "rights". See, e.g., West v. Wright, supra; Application of Trower, 260 Cal. App.2d 75, 66 Cal. Rptr. 873 (D. Ct. App. 1968); Application of Shipley, 26 Misc.2d 204, 205 N.Y.S. 2d 581 (Sup. Ct. 1960).
If the language of the cases is to be followed, only some undefined "right" of the father is to be weighed against the possible detrimental effects on the child of continued use of his surname. So put, the question of the "welfare and happiness" of the child might be readily resolved. The conflicting interests here, however, should not be viewed so narrowly.
*220 To that extent that the paternal "right" represents a recognition of a father's interest in perpetuating his own name or in protecting his ego or in preserving his perceived male prerogatives, it may have little or no relevance to the best interests of the child or the propriety of a name change. But to the extent the "right" recognizes the father's interest in maintaining his relationship with his child for their mutual benefit, it becomes highly relevant.
Cases in other jurisdictions have expressed the father's "right" in just such terms. In Degerberg v. McCormick, supra, the court noted that authority "recognizes that a change of surname of a child of divorced parents may contribute to estrangement of the child from his father", relying in part upon psychiatric testimony presented to that court that an attempted change of name "created a `wedge'" in the child's relationship with his father, and that his continued use of the stepfather's name "will have a serious, adverse effect upon the child's development in his formative years." Similarly, in Mark v. Kahn, 333 Mass. 517, 131 N.E.2d 758, 53 A.L.R.2d 908 (Sup. Jud. Ct. 1956), the court expressed the view that
The bond between a father and his children in circumstances like the present is tenuous at best and if their name is changed that bond may be weakened if not destroyed. * * * A change of name may not be in the child's best interest if the effect of such change is to contribute to the further estrangement of the child from a father who exhibits a desire to preserve the parental relationship. [131 N.E.2d at 762]
And in Robinson v. Hansel, Minn. 223 N.W.2d 138 (Sup. Ct. 1974), the same considerations were stated in the following language:
* * * courts have traditionally tried to maintain and to encourage continuing parental relationships. The link between a father and child in circumstances such as these is uncertain at best, and a change of name could further weaken, if not sever, such a bond. [223 N.W.2d at 140].
Whether using language of paternal "right" or these more relevant terms relating to the child's well-being, the cases of *221 other jurisdictions almost uniformly have rejected contentions that a child's psychological health requires that his name conform to that adopted by his mother on remarriage. See, e.g., Degerberg v. McCormick, supra; Mark v. Kahn, supra; Robinson v. Hansel, supra; West v. Wright, supra; Application of Trower, supra; Application of Shipley, supra; Application of Hinrichs, supra; Marshall v. Marshall, 230 Miss. 719, 93 So.2d 822 (Sup. Ct. 1951); Reed v. Reed, 338 P.2d 350 (Okl. Sup. Ct. 1959); contra, Newman v. King, supra; In re Adoption of McCoy, 31 Ohio Misc. 195, 60 Ohio Op.2d 356, 287 N.E.2d 833 (C.C.P. 1972).
The apprehensions which reasonably arise as to the possible effects of a name change, like the contrary apprehensions expressed by plaintiff, are persuasive and serious. A change of name imposed upon a child could represent to him a rejection by his father; or evidence that his father is deserving of rejection or contempt; or an attempt by his mother to deceive him as to his true identity; or a statement by his mother and stepfather that his true identity is a shame and embarrassment to them and others. Such consequences could be enormously harmful to the child. They are, of course, conjectural, but no less so than are the "psychological implications" foreseen by plaintiff.
The record thus generates only two conflicting groups of speculations as to the possible effects of a name change. No expert testimony has been offered, and no academic literature has been found, to assist in the weighing of these speculations. The realities are that the child's present name represents his identity, his paternity and a remaining bond with his father. There is no sound basis to conclude that any tampering with these realities would advance the best interests of the child. Cf. In re Adoption of Children by D., 61 N.J. 89, 93 (1972); In re N., 96 N.J. Super. 415, 425 (App. Div. 1967). The application must therefore be denied.