SHEILA A. MULLINS, a/k/a Sheila Michaelson, Respondent-Appellant, v. PHILIP A. MULLINS, Petitioner-Appellee.

First District (5th Division)   No. 85—1107

Opinion filed March 21, 1986.

Marian Henriquez Neudel, of Chicago, for appellant.

James M. Sulzer, David G. Wilkins, and William T. Donahue, all of Strauss, Sulzer, Shopiro & Wilkins, Ltd., of Chicago, for appellee.

PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

Respondent appeals from an order transferring to petitioner permanent custody of the parties' two minor children, contending, essentially, that the trial court's ruling was contrary to the manifest weight of the evidence.

The record discloses that Sheila Michaelson, formerly Sheila Mullins (respondent) and Philip Mullins (petitioner)[1] were married from August 12, 1972, until May 11, 1983, when a judgment of dissolution of the marriage was granted to respondent. Incorporated therein was a settlement agreement awarding custody of their two minor children—Matthew, age 6, and Katherine, age 4—to her with liberal visitation rights granted to petitioner.

A detailed chronological account of the procedural history of this protracted litigation is both relevant to and necessary for an understanding of the issues presented. On June 2, 1983, petitioner filed a petition for modification of custody and a rule to show cause together with an affidavit alleging, *inter alia*, that in an attempt to force him to allow Larry Michaelson (Michaelson)—whom respondent subsequently married—to adopt the children and in retaliation for his refusal to do so, respondent (a) terminated all contact between him and the children by denying him the visitation rights provided for in the judgment of dissolution and any telephone communications with them, and (b) deliberately confused the children by telling them that their surname was to be changed to Michaelson and directing them to call Michaelson "daddy."

The June 2 petition was subsequently withdrawn by agreement of the parties, but in November 1983, petitioner filed another petition for rule to show cause, alleging continued violations of his visitation rights by respondent. Shortly thereafter, respondent filed a report

---

[1]Although Mrs. Michaelson has designated herself as "petitioner" in her brief, she was, in fact, the respondent to the petition for modification which is at issue and will be so identified in this opinion.

with the Department of Children and Family Services (DCFS) of sexual abuse by petitioner of the children in May and June 1983. She also petitioned in the trial court for a psychiatric examination of him and for termination or restriction of his visitation, alleging as grounds therefor acts of violence and sexual perversion by him in the children's presence as well as failure by him to protect their safety or provide for their well-being while they were in his care. Due to a preliminary finding by the DCFS that respondent's sexual abuse charges were "founded," the trial court ordered on January 5, 1984, that visitations be supervised pending receipt of psychiatric evaluations of both parties.

During February 1984, petitioner variously filed (a) a motion to amend the interim visitation order claiming, *inter alia*, noncompliance by respondent with it, (b) a petition for a temporary restraining order to enjoin respondent from moving to Florida with the children and from obstructing his attempts to exercise the visitation rights granted by the court in its January order, (c) a motion to hold respondent in contempt of court for refusing to permit a scheduled visitation—which he voluntarily withdrew when she agreed to a make-up visit, and (d) a petition for rule to show cause for various other incidents of interference with his efforts to communicate and visit with the children. Following this series of petitions and motions, respondent filed (a) a second complaint with the DCFS charging that petitioner had sexually molested their daughter in a restaurant on February 22, 1984, and (b) a verified emergency petition for termination of his visitation rights and for a rule to show cause in which she additionally alleged that petitioner had threatened, bribed, attempted to brainwash and, on one occasion, physically assaulted both children and repeatedly harassed her and Michaelson, who had been supervising the visitations.

At the March 27, 1984, hearing thereon, petitioner testified generally that since the divorce, respondent had consistently attempted to deny him contact with the children. Specifically, he testified to difficulties he encountered during the previous three months of court-ordered, supervised visitations. On one occasion in late January 1984, when Matthew was ill, respondent refused to allow him visitation with Kathy unless his fiance's daughter, who had accompanied him to the restaurant as his witness, sat at another table. On the next scheduled date, February 12, respondent called him at the restaurant to cancel visitation because Michaelson was unable to supervise it, and when he suggested that she or someone else substitute as supervisor or that they arrange another time or day, she cursed at him and hung up. The following week, he asked to see the children at a restaurant closer to

his home, but Michaelson denied the request, saying, when reminded of the court order, that he (petitioner) could "take [the] court order and shove it." Later that day he received a mailgram from Michaelson advising him where and when visitation would be allowed and suggesting he telephone for any additional information he might need, but when he did he received no answer, nor did Michaelson respond to the message he left on the answering machine. A make-up visitation was arranged by the parties' attorneys for February 22, and on that date, as he was apologizing to the children for not seeing them the previous week and assuring them that he loved and missed them, Michaelson spoke out from another table, telling the children that he was a liar and not to pay any attention to him. A short time later, he brought Kathy to his side of the table, put his arm around her and read the Valentine's card he brought for her, but when their meals arrived, she returned to her seat across from him and remained there until they left. The following week, February 26, he and his fiance arrived at the restaurant before Michaelson and the children and requested two tables but were told that only one was available and that there would be a 15-minute wait for the other. Upon learning of the delay, Michaelson insisted that the children not be seated until his table was ready. when petitioner protested, noting the short time allotted for the visitation, Michaelson grabbed the children by their wrists, said, in the presence of a crowd of patrons waiting to be seated, "I'm not leaving them here, we already have you under investigation for *** sexual molestation to [sic] your daughter, and I'm not about to leave them here with you," and took them out of the restaurant. On March 4, because Michaelson was unable to supervise, respondent brought the children to the restaurant and waited out in the car. At one point during the visit, Kathy informed him that respondent had instructed her to tell people that he fondled her, but that she (Kathy) knew that was not true.

On cross-examination, petitioner denied molesting Kathy as she sat next to him on February 22, grabbing or having used physical force against either of the children to prevent Michaelson from removing them from the restaurant on February 26, or having threatened them to refrain from giving information about him to anyone; to the contrary, because of Kathy's remarks concerning what respondent instructed her to say, he specifically directed both children to always tell the truth.

Following the brief, but essentially corroborative testimony of the petitioner's fiance and her adult daughter, respondent called Sandra Roy, the DCFS social worker who conducted the initial investigation

of respondent's November 1983 sexual abuse complaint against petitioner. Ms. Roy summarized the allegations made by respondent and the interviews she conducted with the family members and stated that although the children did not admit to having been sexually abused by petitioner, it was her opinion, based on respondent's apparent sincerity, the children's anxious demeanor and petitioner's "too cooperative and calm" attitude during her respective interviews with them that such abuse was "indicated." With respect to the six-month lapse between the alleged incidents and respondent's report thereof, she at first stated that "people hesitate to call DCFS," but then acknowledged that she had found—and noted—the delay in reporting "unusual."

Bonnie Nuenschwander, the DCFS caseworker who investigated respondent's February 1984 sexual abuse complaint, also testified regarding conversations with the family members, including statements by Kathy concerning a "pinching" game petitioner played with her and that it was her opinion, as reflected in her report, that sexual abuse by him was "indicated." On cross-examination, however, she acknowledged that she had read Ms. Roy's earlier report prior to preparing hers; that Matthew said nothing to indicate sexual abuse; that in her report, she noted that both parties appeared to be loving parents; and that the children had been undergoing psychological therapy for two months and had been referred to the Psychiatric Institute for additional evaluations—the results of which she had not seen. The trial court found the evidence insufficient to warrant termination of visitation, but ordered future visits to occur under the supervision of a licensed, professional supervisor rather than Michaelson.

In late May 1984, respondent and Michaelson took the children, without leave of court, to live in Florida, and on June 5, 1984, petitioner filed a petition for temporary custody. The trial court immediately entered an order directing respondent to return to the jurisdiction with the children, and on June 22, held her in contempt for failing to do so and issued an order directing her arrest. Shortly after her return to Illinois—on October 12, 1984—petitioner filed an amended petition seeking a permanent change of custody together with an affidavit asserting, on various grounds, that the children's physical, mental, moral and emotional health was seriously endangered by their environment.

Although we have reviewed and carefully considered the voluminous record of the trial thereon, which consists of approximately 1,000 pages of transcript from 13 days of hearings, we will set forth only that evidence—extensive in itself—most relevant to the argu-

ments raised on appeal.

As in the earlier hearing, petitioner testified at trial that beginning in May 1983, when the dissolution judgment was entered, respondent consistently attempted to deny him the visitation rights granted therein, noting that he was allowed only two post-judgment visits in May and one in June, and that it was not until he filed the first petition for modification and rule to show cause that she promised there would be no more problems. Visitations occurred fairly regularly, though with some difficulties, from late July through October. In late October, he noticed a label reading "Michaelson" in Matthew's coat, and upon inquiry, Matthew told him that respondent put it there because she wanted them to use that name rather than their own, and then began to cry, stating that he "didn't know what to call [himself] anymore." Despite a provision in the judgment allowing him to visit with Kathy on her birthday—November 4—respondent denied him visitation on that day and only after several unsuccessful attempts was able to arrange the next visitation for November 23. He arrived at respondent's house at the appointed time on that date but no one was there, and after waiting for about an hour, he went home and telephoned her. She told him that she had been detained and that he could come back for the children, but when he did, no one answered the door. Hearing music from within, he went to a side window, looked inside and, finally, started walking back to his car. At that point, the police arrived and informed him that they had received a call of a burglary in progress. Respondent and Michaelson then came out and signed a complaint against him for damaging their front door, whereupon he left without seeing the children.

During a telephone conversation with her the following week, respondent refused his request to take the children to his home for Thanksgiving as was provided in the custody agreement, but later that evening she called him and said that because they were "crying and carrying on" about her decision, if he still wanted them, he should "come now or I'll kill them." He immediately drove to the house and knocked on the door, but, like the previous visit, received no response. A few minutes later, the police arrived, informed him that respondent had called them and they asked him to leave. The day after Thanksgiving, he filed a petition for rule to show cause why he was denied visitation and a few days later, respondent filed the first of her two sexual child abuse complaints against him with the DCFS. On the advice of his attorney, he did not request visitation during December 1983 nor did respondent contact him thereabout. Following his testimony regarding the court-ordered, supervised visitations be-

tween January and May 1984, which was substantively the same as that he gave at the March 27 hearing on respondent's petition to terminate visitation, petitioner testified concerning his plans and ability to care for the children if he were granted custody of them, asserting that he was the president of his own computer sales and service business; that he drew an annual salary of approximately $24,000 and lived with his fiance and her two teenage daughters in a five-bedroom rental home; that they planned to be married as soon as "things calmed down"; that he enjoyed a close and loving relationship with the children and would arrange for them to attend school across the street from his home and be cared for in a reputable day-care center for the few hours each day between their dismissal from school and his or his future wife's arrival home; that he appreciated and was capable of dealing with certain physical disabilities Matthew experienced and that he would not deny respondent reasonable visitation with them.

On cross-examination petitioner stated that he and his fiance had not set a date to be married; that he had taken the children out in his Corvette on a few occasions in summer 1983, despite respondent's objections to the lack of individual seat belts therein; and that excepting one month in 1983, he timely paid respondent—or put in an escrow account while she was in Florida—$520 each month for child support. He further acknowledged that the children were present when, pursuant to the court's order, the sheriff—who he had called—took respondent into custody upon her return from Florida.

Sara Lieber, a registered social worker selected by the court to supervise visitations, testified that during their first meeting in early May 1984, respondent repeated the sexual abuse charges she had filed against petitioner and also claimed that he did not take proper care of Matthew, whom she [respondent] described—often in his presence—as a severely handicapped child suffering from a birth defect involving malformation of his joints. Upon meeting Matthew, however, she noted that while he appeared to have some minor physical limitations, he was eager to demonstrate his strength and agility, and observed, on that day and subsequent occasions, that he was able to run, skip, skate, ride a standard bicycle and play pinball and that he resisted all offers of assistance in the performance thereof. Nevertheless, respondent consistently and strenuously objected not only to any visitation plans which included activities of a physical nature, but to most aspects of petitioner's life and to almost all plans she did not personally devise—subjects they discussed during a meeting in late May at her attorneys' office regarding the necessity for cooperation in ar-

ranging the court-ordered visitations. She next tried to call respondent in early June 1984, to confirm a scheduled visitation but learned that respondent, Michaelson and the children had moved to Florida. Court-ordered visitations resumed following respondent's return to Illinois in October 1984, but as with the earlier visitations, she often expressed objections to the nature and location thereof and, finally, requested that a new supervisor be appointed.

It was Lieber's opinion, based on respondent's past behavior, that she (respondent) did not want visitations between petitioner and the children to occur; that absent court intervention, future visitations were unlikely; and that due to her desire for complete control over the children's lives any such visitations would occur only at her initiation and convenience and without any input from petitioner. It was also her opinion that petitioner interacted well with the children; that they responded positively and warmly to him; and that there was no evidence to substantiate respondent's allegations of sexual abuse or inappropriate sexual behavior by him—charges which respondent had not mentioned since the initial interview. On cross-examination, Lieber stated that the children were also affectionate toward respondent and Michaelson, but on redirect examination noted that respondent's frequent references to Matthew's birth defect seemed to cause the child considerable stress and embarrassment.

Francis Shefler, an associate of and the replacement for Mrs. Lieber as visitation supervisor, also testified to having substantial difficulties with respondent in arranging visitations, noting in particular that on two occasions in November 1984—one of which was a party planned by petitioner for Kathy's birthday—respondent failed to make the children available; that following one visitation, respondent threatened that her aunt and uncle—with whom respondent was then living—would kill or otherwise harm petitioner in some manner if he ever returned there; and that respondent attempted in some manner to obstruct each of the five visitations she supervised. On cross-examination, Shefler acknowledged that respondent agreed to a make-up visitation three days after Kathy's birthday, and that some schedule changes were initiated by her or petitioner.

Officer Paul Schaetzle testified that he responded to a call of criminal damage to property at respondent's home on November 27, 1983. When he arrived, he observed petitioner sitting in his car and a small—approximately 1 inch—scratch or nick on respondent's front door. Nevertheless, respondent insisted on signing a criminal damage to property complaint against petitioner, claiming that when she refused to allow him to take the children for visitation, he pounded on

the front door in an attempt to get inside.

Officer David Kleinpaste testified that respondent filed a battery complaint against petitioner following an incident between him and Michaelson in a restaurant on February 26, 1984, but an investigation produced no substantiation of the allegations, and after consulting with representatives of the State's Attorney, he advised her that no charges would be filed. Sometime later, respondent filed a report charging that petitioner had sexually abused their daughter during a restaurant visitation, but again, conversations with the hostess there, the children, petitioner, respondent and Michaelson produced no evidence indicating such an incident had occurred. Finally, following a conversation with Michaelson's former wife in which she informed him that she had just become aware that a babysitter hired by Michaelson in May 1983 had sexually molested one of her children in Kathy's and Matthew's presence, Kleinpaste telephoned Ms. Roy of the DCFS, conveyed this information as well as the other results of his investigation and then closed the sexual child abuse case against petitioner.

Lynn Michaelson testified that she and her former husband had been married for 13 years; that during the marriage he frequently beat their son Robbie, the eldest of their four children; and that following their separation in 1983, he filed numerous complaints with the DCFS accusing her of neglect and abandonment of the children— charges ultimately determined to be "unfounded." During a May 1983 visitation with her older daughter, Valerie, who was living with Michaelson at the time, the child complained that her ribs hurt and that she was having breathing difficulties. Upon examination at a nearby hospital, she was found to be suffering from pneumonia. That same day, Valerie also related a recent incident involving certain sex-related "games" initiated by a young male babysitter hired by Michaelson a few weeks earlier. When Robbie came back to live with her in February 1984, she noticed bruises on the backs of his legs, which, he said, were inflicted by Michaelson; he also told her that Michaelson had spit on him. During a subsequent telephone conversation, Michaelson told her he wanted nothing more to do with Robbie, but later that day, he came to her house with the police and attempted to take him. Robbie was unable to attend school until two months later when she regained permanent custody of him because Michaelson forbade her to register the boy as long as he still had legal custody, stating that he did not want to be responsible for him. On cross-examination, Mrs. Michaelson stated that Michaelson owed her $8,000 for child support and that as a result, she was experiencing severe financial problems. She also acknowledged that Robbie had lied on various occasions in the

past and that despite the history of beatings she had related she voluntarily gave Michaelson custody of him in 1983.

After examination by the court to determine competency, Valerie Michaelson, 8 years of age at trial, testified regarding the incident with the babysitter, which occurred in late April 1983, and that she had informed Michaelson and respondent of it in May of that year. She further testified that they insisted that Kathy and Matthew refer to Michaelson as "daddy" and that they spanked or in other ways punished the children when they refused or when they referred to petitioner as "daddy." On cross-examination, Valerie stated that despite repeated complaints to respondent and Michaelson regarding the symptoms later diagnosed as pneumonia-related, they refused to do anything for her, angrily directing her just to take some aspirin and lie down. She admitted that she was angry with her father for not paying child support and for telling her not to call him anymore but maintained that her feelings would not prompt her to lie about him.

Edlynne Sillman, a caseworker for the Cook County Department of Supportive Services, testified that pursuant to an April 1984 order of the trial court, she conducted an investigation of the sexual abuse charges filed against petitioner by respondent in February of that year. During their conversation, respondent made numerous other allegations of abnormal sexual behavior by him including that he watched pornographic movies several hours each day, sometimes even when the children were present. When she first met the children, Kathy seemed very anxious to tell her that petitioner had squeezed her buttocks, but upon further questioning they told her that when visiting petitioner, they watched Walt Disney films and played video games such as "Pac-Man." Kathy exhibited no fear of petitioner and said that she loved him, missed him and enjoyed their visitations. When confronted with respondent's charges, petitioner denied them, stating that he had information that respondent had been advised that the filing thereof would assure termination of his visitation rights. She further testified that Lynn Michaelson told her that following their divorce, Michaelson filed numerous, similar complaints with the DCFS against her. Although respondent denied her permission to observe the children in petitioner's presence, based on these and other interviews with persons who knew the parties involved, it was her opinion, as noted in her report, that if the children had been sexually abused, it was by someone other than petitioner; and that it was imperative for their well-being that they maintain their relationship with him; that respondent cease in her attempts to turn them against him and recognize his role as their father; and that they undergo addi-

tional therapy.

Respondent testified that, contrary to his assertion, petitioner had four visitations with the children in May 1983, but because, on the last occasion, he brought them home dirty, sunburned and unfed and later hung up on her when she called him to discuss the matter, she denied his next request to see them. Following their return from a weekend visit to his parents' home in Michigan in early June, she found the children masturbating in their bedrooms and when questioned, Kathy told her that it was "a game" she and daddy played, specifying when asked that she was referring to "daddy Phil" (petitioner). She called a local hospital that night but on the advice of her family physician, whom she called the next day, she decided not to subject Kathy to a full physical examination for sexual molestation. She also called petitioner the next day to inquire about Kathy's statement, but again, he told her to "go to hell" and hung up. She then called her attorney who assured her that he would "work it out" with petitioner's attorney, but warned her not to deny him visitation in the meantime. She also made an appointment with a child psychologist for psychological evaluation of them. On June 26, petitioner called her and said that it was possible the children had "gotten into some porno films and magazines" at the home of one of his friends and promised that such materials would be put away in the future. A recess was taken and when the hearing resumed a few days later, petitioner testified that on June 26, as she was unpacking from a camping trip, petitioner let himself into her house, confronted her on the stairway and angrily demanded to know why she had violated the visitation agreement by taking the children out of town. She explained that she had tried, but was unable, to contact him before leaving, but he thrust his fist toward her face and continued to shout at her about taking his children on a vacation without his permission. Although visitations occurred regularly in July, she and petitioner argued several times about her objections to the lack of individual seat belts in his Corvette. In accordance with her wishes, throughout most of August and September he used his station wagon instead, but on September 25, he came over in the Corvette again and another argument ensued, during which he "pinned" her against the car and warned her, using obscene language, that she should not tell him what to do with his children. A few weeks later, visitations resumed and continued throughout most of October. In early November, she called petitioner to inform him of her plans to have a birthday party for Kathy and suggested that because he had not seen the children for a while he either come to the party or take Kathy out for ice cream afterward. He angrily re-

sponded that the custody agreement allowed him visitation with Kathy that day and threatened that, if necessary, he would bring the police with him to secure his rights; he did not, however, carry out his threat. Another visitation was scheduled for 1 p.m. on November 20, but, after waiting for petitioner for 1½ hours, she and the children made a brief trip to the store. Shortly after their return, at about 2:30, petitioner drove up to the house and ran up to the front door and began pounding on it. Upon informing him that she had called the police and would not open the door until they arrived, he walked around the house and tried to gain entry through the back door. When the police arrived, she came outside, to explain to petitioner why no one was home when he came for the children earlier, but, because of his agitated state, she did not allow him to see or take the children. She then noted that he had damaged the front door, whereupon the police intervened and, after she signed a complaint, issued him a citation for criminal damage to property. A few days later, on Thanksgiving eve, she called him to request that he postpone his Thanksgiving visit with the children until after dinner since he had not planned to prepare a traditional meal for them, but he refused. She then suggested that he come for the children that evening so that they would not see her preparing a meal they could not share. Shortly thereafter, she saw a car pull up in front of the house and, although she had never seen it before, she walked the children out toward it with their overnight bags. They were approximately four feet from the car when she saw petitioner in the driver's seat. He then sped away and for the next 10 or 15 minutes drove up and down the block racing the engine, slamming on the brakes and turning the headlights on and off. He then parked the car directly across from and facing the house and turned the headlights on. After she took the children back inside, he sped up and down the street a few more times and then drove away. Five minutes later, he drove up in his station wagon, and as he had done a few days earlier, began pounding on and kicking her front door. When both she and Kathy refused to let him in, he walked back to his car, where he remained until the police—whom she had called—arrived and she again refused to allow him to take the children because of his violent conduct. The next day she called her attorney and sometime later contacted the DCFS to report the children's behavior and what Kathy had told her following their weekend visitation with petitioner the previous June. Following the investigation and report by Sandra Roy indicating that her charges were "founded," she filed the petition for termination or restriction of visitation and for psychiatric examination of petitioner. Pursuant to

a court order, all visitations from January through May 1984 occurred at restaurants and were usually supervised by Michaelson. After one such visit, on February 22, Kathy told her, in essence, that as she sat next to petitioner in the restaurant booth, he molested her. She (respondent) immediately reported the incident to the DCFS and filed another emergency petition for termination of visitation (on which the previously-reviewed March 27 hearing was held) after which visitations were temporarily suspended. In May 1984, Sara Lieber was appointed visitation-supervisor. Despite having knowledge of Matthew's handicap, Lieber told her, during an argument concerning the dangers of taking him to a public playground, that she had "better get used to" the fact that she had no voice in planning visitations. In early June, she, Michaelson and the children moved to Florida because the climate was better for Matthew's condition and there were greater employment opportunities for Michaelson. Approximately one week later, she called petitioner to notify him of the move. When she and the children returned to Illinois, visitations resumed under Lieber's supervision but due to Lieber's continued disregard for her wishes with respect to Matthew's health and her objections to visitations at petitioner's home, she requested a new supervisor. In early November, she met with Francis Shefler—Lieber's associate and replacement. During their discussion about the children, she showed Shefler Matthew's arm, explained his handicap and specified certain activities to avoid. From the time of their return to Illinois and the commencement of trial, petitioner visited with the children approximately three times each week.

On cross-examination and when called as an adverse witness, respondent denied telling Sandra Roy that Kathy would not reveal with whom she played the "games" she described, but then acknowledged having so testified in a deposition taken in January 1984. She also acknowledged that when deposed, she explained that she did not immediately report the alleged sexual abuse by petitioner because her attorneys told her there was nothing she could do except "make him swear it would never occur again," and that she decided to "go into all this" only after he charged her with violations of his visitation rights. She conceded that even prior to their marriage the children referred to Michaelson as "daddy Larry"; that although registered under petitioner's surname, only Michaelson was named—as stepfather—on their Florida school registration; that Matthew signed "Michaelson" as his surname on school papers; that the teachers referred to the children as "Michaelson" and issued their report cards in that name; that until shortly before trial—when admonished by her

attorneys that they were to use petitioner's surname—she encouraged the children to use Michaelson's name and to call him "daddy"; and that she and Michaelson had discussed his adopting the children.

A separate hearing was conducted by the DCFS on October 24, 1984, following which the officer presiding thereat issued a report, (a) finding no evidence of sexual abuse or of risk of harm to the children by petitioner, (b) expressing concern that, to the contrary, respondent was causing them harm by using sexual abuse allegations to terminate their contact with him, and (c) recommending that the case be "overturned." In late November the deputy director of the DCFS's Division of Child Protection wrote a letter to petitioner's attorney stating that he concurred in the hearing officer's findings and that both of respondent's sexual abuse reports against petitioner had been expunged from the agency's files as of November 20, 1984.

On December 19, 1984, the trial court vacated its order requiring supervision of visitations and allowed the children to stay with petitioner while respondent returned to Florida for the Christmas holidays. Finally, on January 18, 1985, the court entered a verbal order, later reduced to written form, immediately transferring custody of the children to petitioner. This appeal followed.

OPINION

Modification of a prior custody judgment is governed by section 610 of the Illinois Marriage and Dissolution of Marriage Act (IMDMA) (Ill. Rev. Stat. 1983, ch. 40, par. 610, amended by Pub. Act 82—715, sec. 1, eff. July 1, 1982; Pub. Act 82—1002, sec. 2, eff. Sept. 17, 1982), which currently reads, in relevant part:

> "(a) Unless by stipulation of the parties, no motion to modify a custody judgment may be made earlier than 2 years after its date, unless the court permits it to be made on the basis of affidavits that there is reason to believe the child's present environment may endanger seriously his physical, mental, moral or emotional health.
>
> (b) After the expiration of the 2 year period following a custody judgment specified in subsection (a) of this Section, the court shall not modify a prior custody judgment unless it finds by clear and convincing evidence, upon the basis of facts that have arisen since the prior judgment or that were unknown to the court at the time of the prior judgment, that a change has occurred in the circumstances of the child or his custodian, ***and that the modification is necessary to serve the best interest of the child." Ill. Rev. Stat. 1983, ch. 40, pars. 610(a), (b).

Except for the added provision allowing the parties to stipulate to the filing of a petition for modification of a custody judgment entered less than two years earlier, the language of subsection (a) remains unchanged. (See Ill. Rev. Stat. 1979, ch. 40, par. 610(a).) Under the previous version of subsection (b), however, the trial court could not modify a prior custody judgment unless it found not only that a change in the child's or the custodian's circumstances had occurred and that modification was in the child's best interest, but also that one of the following three conditions existed: (1) the custodian agreed to the modification; (2) the child had been integrated into the petitioner's family with the custodian's consent; or (3) the child's current environment seriously endangered his or her physical, mental, moral or emotional health and the advantages of transferring custody outweighed the harm to be caused by a change of environment. (Ill. Rev. Stat. 1979, ch. 40, par. 610(b).) While the existence of any of these factors remains a relevant consideration in determining whether modification is warranted (*In re Custody of Dykhuis* (1985), 131 Ill. App. 3d 371, 475 N.E.2d 1107; *In re Marriage of Wechselberger* (1983), 115 Ill. App. 3d 779, 450 N.E.2d 1385), by eliminating the requirement that at least one be present, the amended version of section 610(b) has broadened or liberalized the bases on which modification may be made (*In re Custody of Carter* (1985), 137 Ill. App. 3d 439, 484 N.E.2d 1175; *In re Marriage of Wechselberger* (1983), 115 Ill. App. 3d 779, 450 N.E.2d 1385). At the same, however, it imposes a more exacting level of certainty in modification determinations, mandating that the petitioner establish by clear and convincing evidence—rather than by a preponderance of the evidence—that the requisite change in circumstances has occurred and that modification is in the child's best interest. *In re Custody of Dykhuis* (1985), 131 Ill. App. 3d 371, 475 N.E.2d 1107; *In re Marriage of Wechselberger* (1983), 115 Ill. App. 3d 779, 450 N.E.2d 1385.

■ Additionally, we note that although the amended version of subsection (b), unlike its predecessor, refers to modifications "after the expiration of the 2 year period following a custody judgment specified in subsection (a)," and that it would therefore appear that the standards for modification set forth thereunder do not apply to petitions filed within two years, this court has recently determined that they do. (*In re Custody of Carter* (1985), 137 Ill. App. 3d 439, 484 N.E.2d 1175.) Noting that under the previous enactment of subsection (a) emergency petitions for modification on which hearings were granted were governed by the same standards—*i.e.*, those in subsection (b)—as were petitions filed more than two years after the pre-

vious judgment (see *In re Marriage of Strader* (1981), 101 Ill. App. 3d 779, 428 N.E.2d 912), the *Carter* court concluded that the failure to specify what standards apply to the amended version was simply a legislative oversight and held that the requirements of subsection (b) are also applicable to petitions initially brought under subsection (a). See also Ill. Ann. Stat., ch. 40, par. 610, Historical and Practice Notes, at 42 (Smith-Hurd 1985 Supp.), stating, "[a]lthough the amendment does not specify the standard a court is to apply when the parties stipulate to opt out of the requirements of subsection (a), the standard of subsection (b) logically would apply."

■ Unchanged by the 1982 amendment is the basic principle that because the trial court is in the best position to observe and judge the credibility of the witnesses and determine the needs of the child involved, custody modification decisions rest within its sound discretion and must be given great deference upon review. (*In re Marriage of Wechselberger* (1983), 115 Ill. App. 3d 779, 450 N.E.2d 1385; *In re Marriage of Friedman* (1981), 100 Ill. App. 3d 794, 427 N.E.2d 261.) Indeed, the supreme court recently took the opportunity, in *In re Custody of Sussenbach* (1985), 108 Ill. 2d 489, 485 N.E.2d 367, to redefine our rule in reviewing custody modification cases. Quoting from *In re Marriage of Wechselberger* (1983), 115 Ill. App. 3d 779, 450 N.E.2d 1385, the court stated:

" 'Section 610(b) reflects an underlying policy favoring the finality of child-custody judgments and making their modification more difficult. Its effect is to create a legislative presumption in favor of the present custodian, thereby promoting the stability and continuity of the child's custodial and environmental relationship which is not to be overturned lightly. [Citations.] However, once the trial court has determined that the presumption has been overcome, the court of review will not disturb that determination on appeal unless the trial court's decision was contrary to the manifest weight of the evidence or amounted to an abuse of discretion. [Citation.]' " *In re Custody of Sussenbach* (1985), 108 Ill. 2d 489, 499, 485 N.E.2d 367, 371.

Preliminarily, we note that prior to rendering its decision, the trial court in the case before us stated that the modification petition at issue, filed approximately 18 months after the initial custody judgment, had been allowed under section 610(a) on the basis of petitioner's affidavit in which he asserted, on various grounds, that there was reason to believe the children's present environment posed a serious danger to their physical, mental, moral or emotional health. Thus, our inquiry is whether, under the standards set forth in section 610(b), the

trial court's decision to modify the initial custody judgment in petitioner's favor was contrary to the manifest weight of the evidence or constituted an abuse of discretion.

Reading from an 18-page memorandum ruling it had prepared, the court delineated the facts it found most significant in reaching its decision, emphasizing, however, that they represented only a "small portion" of the extensive evidence contained in the trial record, all of which it had carefully reviewed and considered. In brief summary, the court found that respondent, with the aid of her present husband and the unwitting assistance of the DCFS and the court, had engaged in a self-serving scheme to terminate petitioner's parental rights and to destroy the children's relationship with him. As evidence thereof, the court noted that beginning almost immediately after entry of the initial custody judgment, respondent unreasonably denied or attempted to deny petitioner the visitation rights set forth in their custody agreement and thereby compelled him to expend considerable time and money in seeking court intervention to enforce them; that she used the incident of sexual behavior by the children in May 1983 as the basis for both the sexual abuse report and the emergency petition for termination or supervision of visitations which she filed six months later, knowing—but failing to disclose—facts she possessed relating to a possible incident of sexual molestation by a babysitter so as to disparage petitioner and enlist the aid of the DCFS and the court in accomplishing her goals; that she unreasonably attempted to thwart even the court-ordered, supervised visitations she had requested; that she endeavored, albeit unsuccessfully, to brainwash and turn the children against petitioner; that she and her present husband sought to deprive the children of petitioner's surname by directing them to refer to themselves as "Michaelson" instead, and to force them to refer to and address Michaelson, rather than petitioner, as "daddy"; that she surreptitiously removed the children from the jurisdiction, thereby depriving petitioner and the children of any personal contact for several months; that she omitted his name from their Florida school registration records "as if he didn't even exist"; and that she returned to the jurisdiction only after he initiated court proceedings in Florida to enforce an attachment order issued in Illinois. The court further found that throughout the course of this "scheme" respondent consistently placed her own interests above those of the children; that they were so adversely affected by her actions that they required and continue to require therapy to remedy the harm caused thereby; that despite the pressures put upon them by respondent in her efforts to alienate them from petitioner, the children continue to

love and express warm feelings for him; that their mental, moral and emotional health would be seriously endangered if they remained in respondent's custody; that petitioner has consistently demonstrated his love and concern for them and placed their interests above his own; that he would be able to provide a stable, loving environment for them and "very adequately" tend to their needs, including those relating to Matthew's physical disability—which, the court noted, appeared far less severe than what he had been led to expect by respondent's testimony; and that the long-term advantages of a transfer of custody to petitioner would outweigh any short-term difficulties which might arise therefrom. Accordingly, the court ordered modification of the initial custody judgment and the immediate transfer of permanent custody of the children to petitioner.

Essentially, it is respondent's position that the trial court's finding of the existence of a "scheme" is not supported by the evidence and that, in any event, the "scheme" described in its order does not constitute sufficient grounds to warrant modification of custody. In her brief, respondent focuses primarily on the court's findings regarding (1) the use of "Michaelson" rather than "Mullins" as the children's surname; (2) the sexual abuse complaints she filed against petitioner; and (3) her conduct in limitating and/or denying visitations.

■ With respect to (1), respondent first asserts that the only evidence that the children had been punished for referring to petitioner as "daddy" or refusing to so address Michaelson, was presented through the "confused, biased, and inherently unreliable" testimony of Michaelson's 8-year-old daughter Valerie, on which she says the court "explicitly stated it relied heavily." Initially we note that although the trial court described Valerie as "aware," "bright," and "honest" and a "very credible witness," nowhere did it state that it "relied heavily" on her testimony. In any event, the court questioned Valerie before allowing her to testify and was satisfied that she could do so competently and truthfully. Since the credibility of witnesses and the weight to be given their testimony are matters within the province of the trial court (*In re Custody of Sussenbach* (1985), 108 Ill. 2d 489, 485 N.E.2d 367), we cannot say that the court's determination was erroneous. Indeed, our own review of Valerie's testimony leads us to agree with the trial court's assessment of her as an honest and articulate witness, and the fact that she acknowledged being angry with her father because of his failure to pay child support and for telling her not to telephone him anymore, does not, in our opinion, establish bias but, rather, illustrates her candor and honesty.

Respondent's next assertion, that the use of the name "Mi-

chaelson" originated at the school they attended briefly in 1984, and that she simply "went along with it even in contexts outside of school" not only lacks record support, but is, in fact, contradicted by (a) petitioner's testimony concerning the Michaelson name-label he found in Matthew's coat, (b) exhibits of school papers and a report card signed and issued respectively in the name "Michaelson," and most important, (c) respondent's own testimony that until admonished by her attorneys just prior to trial, she encouraged the children to use Michaelson's name and to address him as "daddy."

As to her arguments that "an attempt to integrate a stepparent into the family cannot be equated with a 'scheme to alienate' the children from their natural father" and that "at no time was [she] under any order of the court *not* to use the name Michaelson for the minor children," we find the case *In re Marriage of Omelson* (1983), 112 Ill. App. 3d 725, 445 N.E.2d 951, most instructive. In *Omelson*, the natural father of the minor child (Lori) appealed from an order granting a petition by his former wife—Lori's mother and custodian—to legally change Lori's surname from his to that of her new husband (Nichols). In the petition, the mother alleged, *inter alia*, that Lori had been incorporated into the Nichols' household; that upon commencing school, Lori chose to use the Nichols name; and that the legal change of name was in her best interest.

In reversing the order granting the name change, the *Omelson* court reviewed three Illinois cases and several from other jurisdictions discussing the issue and found the majority rule to be that the most important consideration in a proceeding to change the name of a minor is the child's best interest, noting also that particularly where the children are very young, care must be taken "to assure that some purpose of the custodial parent [—such as the desire to punish the natural father or show that all ties to the former marriage are broken—] does not taint the determination of the child's best interest." (*In re Marriage of Omelson* (1983), 112 Ill. App. 3d 725, 730, 445 N.E.2d 951, 955.) The court also recognized the interest of the natural father that his children bear his surname rather than take the stepfather's, especially where the latter has not adopted them and is not legally burdened with an obligation of support, but noted that recent cases focus more on the interests of the child, and quoted at length from the New Jersey case of *In re Application of Lone* (1975), 134 N.J. Super. 213, 338 A.2d 883, discussing the balancing of these interests. The *Lone* court stated in relevant part:

> " 'To [the] extent that the paternal "right" represents a recognition of a father's interest in perpetuating his own name or

in protecting his ego or in preserving his perceived male prerogatives, it may have little or no relevance to the best interests of the child ***. but to the extent the "right" recognizes the father's interest in maintaining his relationship with his child for their mutual benefit, it becomes highly relevant.

*** [A]uthority "recognizes that a change of surname of a child of divorced parents may contribute to estrangement of the child from his father" ***.

\* \* \*

"The bond between a father and his children in [such] circumstances *** is tenuous at best and if their name is changed that bond may be weakened if not destroyed. *** A change of name may not be· in the child's best interest if the effect of such change is to contribute to the further estrangement of the child from a father who exhibits a desire to preserve the parental relationship." [Citation.]

\* \* \*

'*** A change of name imposed upon a child could represent to him a rejection by his father; or evidence that his father is deserving of rejection or contempt; *** or a statement by his mother and stepfather that his true identity is a shame and embarrassment to them and others. Such consequences could be enormously harmful to the child.

\* \* \*

*** Society has a strong interest in the preservation of the parental relationship [citation] and a possible adverse effect on the relationship between father and child is a valid ground for refusing to change the [child's] name ***.' " *In re Marriage of Omelson* (1983), 112 Ill. App. 3d 725, 731-33, 445 N.E.2d 951, 956-57.

That these cases involved petitions for legal change of name renders their reasoning and the principles expressed therein no less, and perhaps more, applicable to the case at bar, where respondent and her husband undertook to change the children's surname without legal approval.

Moreover, although she asserts, in essence, that her purpose for encouraging the use of Michaelson's surname was to integrate the family unit, we note that similar arguments regarding "family integration" and the psychological and social benefits to the child of using the name taken by the mother upon remarriage were advanced and rejected in *Omelson* and the cases cited therein. (*In re Marriage of Omelson* (1983), 112 Ill. App. 3d 725, 445 N.E.2d 951.) In any event,

even when viewed most favorably to her, the totality of evidence, much of which previously has been summarized and need not be restated here, indicates that she had other or, at least, additional motives—which, the court stressed, were major considerations in its determination that her overall conduct constituted a "scheme" to destroy the father-child relationship.

Finally, the fact that she discontinued using or encouraging the children to use Michaelson's name prior to the court's ruling is of questionable relevance in the light of the evidence suggesting that compliance by her with the terms of the custody judgment in the past occurred only when petitioner sought or threatened to seek court intervention.

Similarly, we find no merit in her assertion that the evidence failed to show that the reports of sexual child abuse against petitioner were made in bad faith. First, her own testimony on this subject was replete with contradictions and inconsistencies. For example, although she testified that the reason she waited six months before reporting the first alleged abuse incident was because she did not know the DCFS existed, she also testified that almost immediately after learning of the supposed occurrence, she called a local hospital, her family physician and her attorneys, none of whom, presumably, took or advised her to take any action against petitioner. Indeed, according to her earlier deposition, her attorneys told her there was nothing she could do except "make [him] swear it would never occur again," and it was only after he filed a petition alleging violations of his visitation rights that she decided to "go into all this." She also testified that petitioner called her on June 26 to explain that the children's behavior was likely prompted by some pornographic materials they may have "gotten into" at a friend's home, but later testified that June 26 was the day petitioner came to her house and angrily confronted her concerning the camping trip from which she, Michaelson and the children had just returned. Her various descriptions of the children's conduct following the visitation during which the abuse allegedly occurred were also inconsistent, and her testimony that Kathy named petitioner as the person with whom she had played the "games" she described conflicted with her earlier deposition testimony that Kathy did not identify the person involved. Furthermore, it should also be noted that while Ms. Roy and Ms. Nuenschwander, the DCFS social workers who investigated the 1983 and 1984 report respectively, testified at the March 27 hearing that sexual abuse of the children by petitioner was "indicated," both acknowledged on cross-examination that the children did not admit to having been abused.

■ Additional evidence to support the trial court's belief that respondent's allegations were false—as opposed to mistaken—was presented through the testimony of several other witnesses. Among them was Sara Lieber, who testified that although respondent expressed numerous other reasons why she objected to petitioner's visitations with the children, except during their first conversation, the possibility of sexual abuse was not mentioned as one. Officer Kleinpaste testified that his investigation of the second alleged incident, which included conversations with the hostess at the restaurant where it reportedly occurred, as well as with the parties and the children, produced no evidence to substantiate the charges and that, to the contrary, a conversation with Michaelson's former wife, Lynn, in which she informed him of the incident involving the babysitter led him to believe they were untrue. In addition to her testimony regarding the molestation of her daughter by the babysitter, Lynn Michaelson also testified that her former husband had filed several neglect complaints against her with the DCFS in 1983. Caseworker Edlynne Sillman, who also investigated the allegations, similarly testified to an absence of evidence of abuse by petitioner and noted in her report that it was her opinion that respondent was attempting to turn the children against him. Finally, the officer who presided at the separate DCFS hearing on both complaints of sexual abuse indicated in his report of findings that there was no evidence of abuse or any risk of harm to the children by petitioner and that, to the contrary, it was his opinion that respondent was causing them harm by using the allegations to terminate his contact with them; and in a letter to petitioner's attorney, the deputy director of the DCFS's Division of Child Protection concurred in those findings and ordered the sexual abuse reported expunged from the agency's files. In our view, this evidence not only supports the trial court's findings that respondent deliberately used allegations she knew to be false to denigrate petitioner—both publicly and in the eyes of the children—and to destroy his relationship with them, but also that her conduct so harmed them as to result in their need for psychiatric therapy, and that their mental, moral and emotional health would be further endangered if they were to remain in her custody—grounds which, alone, were sufficient for modification by the trial court of custody under section 610(b). *In re Marriage of Friedman* (1981), 100 Ill. App. 3d 794, 427 N.E.2d 261.

In view thereof, we will address only briefly respondent's assertion that the trial court's remarks, particularly certain closing comments referring to a Minnesota case in which modification of custody was based on wilful denial of visitation indicated that the court or-

dered modification in this case as a sanction against her for wilfully denying petitioner's visitation rights and removing the children from Illinois without leave of court—neither of which, she argues, is a ground for modification in this State. *In re Custody of Potts* (1980), 83 Ill. App. 3d 518, 404 N.E.2d 446.

Initially, we note that the remarks cited by respondent were made after the court had rendered its ruling and the reasons therefor and, contrary to her interpretation thereof, appear to have been intended to stress that its decision to transfer custody to petitioner was not based as much on her conduct as on her motives for certain behavior. Indeed, the court emphasized that wilful denial of visitation and wrongful removal of the child from the jurisdiction are not sufficient grounds for a change of custody in Illinois as they are in Minnesota, but apparently, believed that certain language in that case was relevant to the facts presented here. It appears, however, that the trial court had misplaced its copy of the Minnesota decision and was therefore unable to quote from it. Thus, having no way of knowing the substance of the passage to which it referred, we will not speculate on its relevance.

■ In any event, respondent's reliance on *In re Custody of Potts* (1980), 83 Ill. App. 3d 518, 404 N.E.2d 446, in which we reversed an order granting a change of custody, is misplaced. In *Potts*, the only grounds alleged by the natural father in his petition were that respondent had removed the children from the jurisdiction of the court and failed to comply with a discovery request. Noting not only that removal of a child from the jurisdiction, in itself, is an insufficient basis for modification but also that the father had been found to be destitute and unable to pay child support, we reversed and remanded for further hearings to determine the custody arrangement which would serve the best interests of the children since no finding on that question had been made. The facts before us are clearly distinguishable from those in *Potts*. Moreover, we have also held that wrongful removal of the children may be considered in custody cases to the extent that the evidence indicates that in doing so, the custodian had placed her children in a secondary position to that of her new husband or career (*In re Marriage of Gunter* (1981), 93 Ill. App. 3d 1043, 418 N.E.2d 149), and while we are not suggesting that the prospect of better employment, which would, presumably, raise the standard of living for all members of the new family, is not a reasonable motive for relocation (see *In re Marriage of Burgham* (1980), 86 Ill. App. 3d 341, 408 N.E.2d 37), the evidence here supports the trial court's conclusion that respondent was at least equally motivated by a desire to

deprive petitioner of personal contact with the children and thereby terminate their relationship with him.

Finally, respondent asserts that there was no evidence presented regarding the likely effect on the children from a change of custody from her—with whom they had lived since birth—to petitioner or to what extent such a change could endanger their mental, moral or emotional health or, conversely, serve their best interests, and that the trial court's finding that any initial difficulties they might experience would be outweighed by the long-term advantages of a custody change were, therefore, devoid of record support. We disagree.

The trial court specifically found that respondent had consistently placed her own interests above those of the children and by her actions had caused them mental, moral and emotional harm, which resulted in their need for psychiatric therapy and that remaining in her custody would further endanger them, whereas petitioner had demonstrated that he was more concerned with the children's interests than his own, could provide a stable, loving environment for them and adequately care for their needs. Noting that it had also observed and personally interviewed both children, the court further found that they loved petitioner, enjoyed being with him and missed him when they were not. As we have previously stated, these findings were amply supported by evidence, which included not only the testimony of the parties, but also that of social workers Lieber and Sillman and the report and letter of the DCFS hearing officer and his supervisor, respectively, that respondent's attitude and conduct was contrary to the children's best interests and, in fact, had already had serious, adverse effects upon them. In addition, there was considerable evidence relating to the role played by Michaelson in this course of events and to his relationship with his own children—much of which suggested a dearth of concern by him for their physical, emotional or financial welfare. Although the court did not directly comment on Michaelson, except with respect to the attempt to change the children's name, in its ruling, it did note at trial that as their stepfather and a person able to exercise substantial influence on their lives, his character and conduct were highly relevant to its ultimate determination. (See *In re Marriage of Gunter* (1981), 93 Ill. App. 3d 1043, 418 N.E.2d 149.) In our view it was implicit in the court's findings concerning the disadvantages to the children of respondent retaining custody of them and the advantages to them of being in petitioner's care that modification was necessary to serve their best interests. See *In re Custody of Harne* (1979), 77 Ill. 2d 414, 396 N.E.2d 499; *In re Marriage of Wechselberger* (1983), 115 Ill. App. 3d 779, 450 N.E.2d 1385.

In summary, we conclude that the trial court's findings were not contrary to the manifest weight of the evidence and that they satisfied the statutory requirements of section 610(b) of the IMDMA (Ill. Rev. Stat. 1983, ch. 40, par. 610(b)).

For the reasons stated, the order of the trial court transferring custody of the minor children to petitioner is affirmed.

Affirmed.

PINCHAM and LORENZ, JJ., concur.